

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed September 29, 2018



**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 16-43088-mxm-7 |
| NEDRA DEAN, | § | |
| | § | CHAPTER 7 |
| DEBTOR. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| JOHN P. LESTER AND | § | |
| STAFFING DYNAMICS INTERNATIONAL, L.L.C. | § | |
| | § | |
| PLAINTIFFS AND COUNTER DEFENDANTS, | § | |
| | § | ADVERSARY NO. 16-4147-mxm |
| V. | § | ADVERSARY NO. 17-4004-mxm |
| | § | |
| NEDRA DEAN, | § | (CONSOLIDATED UNDER ADV. PROC. |
| | § | NO. 16-4147-mxm) |
| DEFENDANT AND COUNTER PLAINTIFF. | § | |

## <u>MEMORANDUM OPINION</u>

The Court held a thirteen-day trial to (i) liquidate all claims by and between each of the parties asserted in the Liquidation Complaint,[1] and (ii) determine the Discharge Complaint[2] seeking to (a) deny Nedra Dean's discharge under 11 U.S.C. §§ 707 and 727, or alternatively (b) declare the Lester & SDI Claims as nondischargeable under 11 U.S.C. §§ 523(a)(4) and (6).  For the reasons stated below, all parties failed to prove their respective claims in the Liquidation Complaint, and SDI and Lester failed to prove their claims in the Discharge Complaint.

## I.  PROCEDURAL BACKGROUND

On November 5, 2014, John Lester initiated the Liquidation Complaint against Nedra Dean by filing his *Plaintiff's Original Verified Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction,* Cause No. DC-14-12948 styled *John Lester v. Nedra Dean*, in the 162nd Judicial District Court of Dallas County, Texas.

On August 10, 2016, Nedra Dean filed her voluntary petition for relief under Chapter 7 Bankruptcy Code, staying the Liquidation Complaint pursuant to 11 U.S.C. § 362.

On December 12, 2016, John Lester initiated the Discharge Complaint against Nedra Dean.

On January 11, 2017, John Lester filed a *Notice of Removal of Civil Action to Bankruptcy Court*[3] pursuant to 28 U.S.C. §§ 1452 and 1334(b), Federal Rule of Bankruptcy Procedure 9027, and Northern District of Texas Local Bankruptcy Rule 9027-1, removing the Liquidation Complaint to this Court.

---

[1] *See Plaintiff's Second Amended Original Petition*, Adv. No. 17-4004, ECF No. 11 (the "***Lester & SDI Claims***") and *Defendant's First Amended Answer and Counterclaim*, Adv. No. 17-4004, ECF No. 1, Ex. 58 (the "***Dean Claims***") (collectively, the Lester & SDI Claims and the Dean Claims, the "***Liquidation Complaint***").

[2] *See First Amended Complaint Objecting to Discharge of Debtor Nedra Dean and for Other Relief*, Adv. No. 16-4147, ECF No. 116 (the "***Discharge Complaint***").

[3] Adv. No. 16-4147, ECF No. 1.

On March 17, 2017, this Court entered its *Order Consolidating Adversary Proceedings*[4] in each of the pending adversary proceedings, consolidating the Liquidation Complaint and the Discharge Complaint as noted in the above caption.

## II. JURISDICTION AND VENUE

The Court has subject matter jurisdiction over these consolidated adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of reference in this district. These consolidated adversary proceedings constitute core proceedings over which the Court has both statutory and constitutional authority to enter final orders and judgments pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (I), (J), and (O). Even if this Court would not otherwise have the authority to enter a final judgment, the Court finds that the parties have impliedly consented to the Court's issuance of a final judgment in these proceedings.[5] Venue is proper pursuant to 28 U.S.C. § 1409(a).

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052 and Federal Civil Rule 52.

## III. BACKGROUND

A. **History of business relationship between John Lester and Nedra Dean and the formation of SDI**

The business relationship between John Lester and Nedra Dean[6] began in the late 1990s when John Lester and Nedra Dean previously worked together at a staffing company. Although Nedra Dean worked with John Lester for only a few months at that time, they continued to remain

---

[4] Adv. No. 16-4147, ECF No. 30; Adv. No. 17-4004, ECF No. 9.

[5] Adv. No. 16-4147, ECF No. 30; Adv. No. 17-4004, ECF No. 9.

[6] On December 17, 2013, Nedra Stennis married Ronald Dean and thereafter became known as Nedra Dean. For purposes of this Memorandum Opinion, the Court shall refer to her, at all times, as "***Nedra Dean***."

in contact with one another. After leaving John Lester's employment, Nedra Dean founded Nations Professional Staffing Services, LLC,[7] which specialized in the placement of professional staffing. Nedra Dean specialized in recruiting, credentialing, verifying, and placing medical provider candidates, including medical doctors, dentists, psychologists, certified registered nurse anesthetists, physician assistants, nurse practitioners, and social workers for her company's clients.

By 2004, Nedra Dean had gained valuable experience in the placement and staffing services industry and developed multiple medical staffing contacts. Although she was very talented in her specialty, she readily admits that she lacked skills and experience in "back-office" support services such as accounting, cash flow management, and tax issues. John Lester, on the other hand, had extensive experience in such back-office support services. He graduated from the University of Virginia, where he earned a degree in economics. In addition, John Lester has experience as a small-business owner,[8] a certified financial planner, and a bank regulator for the FDIC.

In 2004, Nedra Dean contacted John Lester about a medical staffing business opportunity whereby Nedra Dean could focus on her contract procurement and staff recruiting talents and skills and John Lester could provide the necessary back-office support services. Shortly thereafter, on January 5, 2005, John Lester, Mary Lester (John Lester's spouse), and Nedra Dean formally

---

[7] *See* Pls.' Exs. 81, 205. Nations Professional Staffing Services, LLC filed its Articles of Organization on June 15, 2000. Its charter was forfeited on August 30, 2002 due to failure to satisfy franchise tax requirements. Even though its charter was forfeited, Nedra Dean testified that the company has not been dissolved. *See* Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 181.

[8] *See* Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 40, 42 (John Lester testimony). In addition to owning SDI, John Lester owns UniCorp Services, Inc., formed in 1991, and Dynamic Staffing Services, Inc., formed in 1994. *See also* Def.'s Ex. I (John Lester discussing his potential insider status with other companies).

entered into a Limited Partnership Agreement[9] forming Staffing Dynamics International, L.P. The limited partnership's primary focus was providing placement and staffing of medical personnel for the partnership's clients. They originally formed the company as a limited partnership "because at the time, the State of Texas did not tax limited partnerships."[10]

The Limited Partnership Agreement detailed each partner's rights, responsibilities, and obligations regarding the partnership. Nedra Dean was primarily responsible for recruiting, credentialing, and verifying medical provider candidates and procuring staffing contracts for the partnership, whereas John Lester was responsible for providing initial startup funding and performing the back-office functions, including accounting and tax related duties.

In December 2009, John Lester, Mary Lester, and Nedra Dean agreed to convert Staffing Dynamics International, L.P. into Staffing Dynamics International, L.L.C.[11] To effectuate the conversion, John Lester, Mary Lester, and Nedra Dean executed a Plan of Conversion[12] effective December 30, 2009. Pursuant to the Plan of Conversion, John Lester and Nedra Dean became the only two managers and members of SDI, each holding a 50% ownership interest in SDI.[13]

---

[9] *Agreement of Limited Partnership of Staffing Dynamics International, L.P.* ("***Limited Partnership Agreement***"), Pls.' Ex. 1.

[10] Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 45 (John Lester testimony).

[11] Unless specifically noted otherwise, Staffing Dynamics International, L.P. and Staffing Dynamics International, LLC shall collectively be referred to as "***SDI***"). John Lester further testified:

> When we first set up Staffing Dynamics, SDI, LP, we did it strategically because of the tax advantage that it afforded our company. I think in year 2009 that tax advantage went away, so now, whether you were an LP or any other entity, the State of Texas changed the taxation of that business so it was no longer practical or deemed viable to keep that format. . . . It gave us the same type of pass-through taxation, the same thing that we were already getting from the LP, but it was just a better structure than the LP. And so we switched.

Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 45-46.

[12] *Plan of Conversion of Staffing Dynamics International, L.P. into Staffing Dynamics International, L.L.C.* (the "***Plan of Conversion***"), Pls.' Ex. 2.

[13] Pls.' Ex. 1 (Assignment Agreement included among documents found at Pls.' Ex. 1).

Following the conversion, John Lester and Nedra Dean entered into an Operating Agreement[14] that became effective January 1, 2010. The Operating Agreement detailed the rights, responsibilities, and obligations of the Managers and Members of SDI. Notwithstanding the conversion of SDI from a limited partnership to an LLC, the Operating Agreement incorporates the Limited Partnership Agreement in several places, and Nedra Dean's and John Lester's actions before and during trial make clear that they thought both the Operating Agreement *and* the Limited Partnership Agreement governed their conduct. The unorthodox dynamic of having two operative documents controlling SDI's affairs caused a lot of the parties' confusion about their rights and obligations, especially when it came to compensation, as noted below.

**B.      Growth of SDI from 2005 through 2011**

When SDI formed, Nedra Dean began operating from her home and John Lester maintained an office in Dallas, Texas. Sometime in late 2005 or early 2006, SDI opened an office in downtown Fort Worth, Texas where Nedra Dean maintained her office. Nedra Dean ultimately relocated to Frederick, Maryland where SDI opened a new office. By 2011, John Lester continued to maintain SDI's Dallas, Texas office employing a handful of "internal" employees (excluding medical staff contractors), and Nedra Dean maintained SDI's Frederick, Maryland office employing approximately ten internal employees. Former SDI employees testified uniformly that prior to 2012; SDI had a pleasant work environment and was a joyful place to work.

The evidence revealed that during these initial years, Nedra Dean, for SDI, was successful in her primary responsibilities of procuring contracts and recruiting and credentialing capable medical staffing candidates for clients. On the other hand, the evidence showed that John Lester

---

[14] *Operating Agreement of Staffing Dynamics International, L.L.C.* (the "***Operating Agreement***"), Pls.' Ex. 3.

failed in his primary responsibilities of back-office support, which lacked controls and was not reliable.  For example, in 2008, Nedra Dean discovered that SDI had failed to file tax returns for years 2005, 2006, 2007, and 2008.  In his testimony, John Lester admitted that it was his mistake that SDI did not file tax returns timely in those years.[15]  As a result, SDI engaged an outside certified public accountant to prepare and file the delinquent tax returns.  Not only were the tax returns not filed, but there were other potential adverse consequences resulting from issues related to tax years 2005-2008.[16]  In addition, as SDI's business steadily grew during its initial years, SDI failed to implement any formal internal accounting policies, procedures, or systems.[17]  Instead, John Lester used and relied upon Excel spreadsheets as SDI's primary accounting records and system.[18]  It was not until 2012 that SDI began to implement needed internal controls and to install QuickBooks as its primary accounting system.[19]

## C.      SDI hires Ronald Dean in late 2011

Seeking to enhance SDI's business development opportunities with the federal government, John Lester and Nedra Dean hired Ronald Dean[20] in April 2011 as SDI's vice president of business development.[21]  By November 2011, John Lester promoted Ronald Dean to Chief Operating Officer of SDI.[22]

---

[15] *See* Adv. No. 16-4147, ECF No. 148, 3/26/18 Trial Transcript at 314-15; Adv. No. 16-4147, ECF No. 156, 4/23/18 Trial Transcript at 36-37.  John Lester's justification for his mistake was that he believed such returns were not necessary because SDI experienced losses each of those years.

[16] *See* Def.'s Ex. KKKK.

[17] *See* Adv. No. 16-4147, ECF No. 149, 3/27/18 Trial Transcript at 32 (John Lester testimony).

[18] *See* Adv. No. 16-4147, ECF No. 148, 3/26/18 Trial Transcript 323-24 (John Lester testimony).

[19] *See* Adv. No. 16-4147, ECF No. 149, 3/27/18 Trial Transcript at 30, 227 (John Lester testimony).

[20] Ronald Dean previously worked for SDI part-time for a few months in 2006.

[21] *See* Adv. No. 16-4147, ECF No. 149, 3/27/18 Trial Transcript at 259-260 (John Lester testimony); *See also* Def.'s Ex. E.

[22] Def.'s Ex. E.

Prior to joining SDI in 2011, Ronald Dean had obtained extensive professional experience spanning over thirty-five years with the federal government and almost as many years working with small businesses in private industry.[23]   Ronald Dean earned his baccalaureate degree from American University.   Since earning his degree, he has worked in the federal government as a statistician, serving as an auditor for the Department of Health and Human Services with a focus on Medicare, Medicaid, and many other social programs in the public health sector, and he also contributed to the writing of various regulations within the Federal Acquisitions Regulations. While working in the private sector, Ronald Dean obtained extensive experience working with small businesses in various capacities, including auditing and reviewing books, records, and other internal controls of companies.   Ronald Dean also has served as project manager for small businesses that held contracts with HUD and other federal government agencies.   Finally, he has extensive experience preparing detailed requests for proposals seeking contracts with the federal government, including for companies that had received the SBA's 8(a) Business Development program certification.[24]   Based on Ronald Dean's many hours of testimony, the Court finds him to be an extremely credible witness (except as specifically noted below) with substantial experience and knowledge in the areas in which he testified.

After joining SDI in 2011, Ronald Dean worked extensively to develop new business for SDI.   In addition, he prepared job position descriptions for SDI's employees, and he established and implemented vital policies, procedures, and internal controls that were lacking for many of

---

[23] *See generally* Ronald Dean testimony at Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 184-91; Adv. No. 16-4147, ECF No. 157, 4/24/18 Trial Transcript at 112-15; Adv. No. 16-4147, ECF No. 163, 5/16/18 Trial Transcript at 94.

[24] *See* 13 C.F.R. § 124.1.

SDI's back-office departments.[25]  Further, as COO, he performed many of the day-to-day functions, such as scheduling and presiding over staff meetings and other typical duties that arise in a small business.[26]

It appears from the evidence that the hiring of Ronald Dean and his subsequent marriage to Nedra Dean proved to be a defining moment for SDI.  Not only had Ronald Dean begun implementing new policies, procedures, and controls in SDI, but from the perspective of a few of SDI's employees, the Deans' marriage changed the dynamics within SDI.  That changed dynamic, along with Ronald Dean's implementation of new internal policies, procedures, and controls, caused a few of SDI's employees to become distressed and leery of the changes.

From the perspective and testimony of Patsy Curtis[27] and Laurie Aldridge, the atmosphere within SDI changed after Ronald Dean joined SDI and married Nedra Dean.  According to Ms. Curtis, "the dynamics" of SDI began to change and "it wasn't that comfortable anymore."[28]  Ms. Aldridge echoed that sentiment, testifying that SDI "was just no longer a tight-knit group" and "when Ron came into the picture, how everything changed."[29]  Based on all the overwhelming credible evidence, however, it appears that the primary source of their disenchantment with Ronald Dean was their having to comply with the new policies, procedures, and job performance requirements implemented by Ronald Dean.  In addition, both witnesses testified that Ronald and

---

[25] *See* Adv. No. 16-4147, ECF No. 157, 4/24/18 Trial Transcript at 122-123 (Ronald Dean testimony).

[26] *Id.*

[27] Patsy Curtis is Nedra Dean's aunt and was instrumental in raising Nedra Dean.  Although Ms. Curtis was a witness for John Lester, Ms. Curtis testified, "Nedra was an awesome person to work with."  Adv. No. 16-4147, ECF No. 143, 3/6/2018 Trial Transcript at 217.

[28] *See* Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 219.

[29] *See* Adv. No. 16-4147, ECF No. 144, 3/7/18 Trial Transcript at 17.

Nedra Dean fired them in 2012.[30] Although the testimony of Ms. Curtis and Ms. Aldridge appeared authentic and heartfelt, neither witness provided any credible evidence to support any of the Lester & SDI Claims in the Liquidation Complaint or Discharge Complaint.

Several witnesses contradicted the testimony of Ms. Curtis and Ms. Aldridge regarding Ronald Dean's impact and influence on SDI. Specifically, Bradley Morris, Clarissa Morris, Constance Lumpkin, Sandra Walker, Cheryl Long, and Luis Figueora each testified that Ronald Dean exhibited an excellent work ethic and was a positive mentor. Although much of the testimony from these witnesses did not have a direct bearing on any of the Lester & SDI Claims or the Dean Claims, their credible testimony provided evidentiary support bolstering this Court's analysis and scrutiny of the testimony provided by John Lester, Nedra Dean, and Ronald Dean. For example, John Lester testified that he was intimately involved in all aspects of SDI, including contract procurement. He further testified that in the late summer of 2012, Ronald and Nedra Dean instructed SDI employees to withhold information from him or they would risk termination. The credible testimony from these witnesses, however, contradicts John Lester's allegations and testimony.

Bradley Morris was an employee at SDI's Maryland office intermittently between 2010 and 2014. Mr. Morris was involved in recruiting and credentialing of medical staff candidates, business development, and contract proposal writing, among other responsibilities. Mr. Morris credibly testified that he was aware that John Lester was an owner of SDI but he had never spoken to or exchanged email communications with John Lester and that John Lester never participated on a conference call or in a meeting attended by Mr. Morris. In addition, Mr. Morris did not know

---

[30] Nedra Dean denies firing Ms. Curtis, and the evidence established that Ms. Curtis continued to work for SDI after her alleged August 2012 firing.

10

what, if anything, John Lester did for SDI. Finally, Mr. Morris could not even identify John Lester in the courtroom (even though John Lester was siting about ten feet from Mr. Morris as he was testifying). On the other hand, Mr. Morris testified that he had worked extensively with Nedra Dean and Ronald Dean and was extremely complimentary of their work ethic, mentoring, training, and support. In addition, Mr. Morris credibly testified that neither Nedra Dean nor Ronald Dean ever instructed or requested that he not communicate with or withhold any information from John Lester.

Clarissa Morris[31] was an employee at the SDI Maryland office from December 2012 through September 2013 as a receptionist and administrative assistant to Nedra Dean. During her brief employment at SDI, she never had any contact with John Lester and she, too, could not identify John Lester in the courtroom. Ms. Morris also testified credibly that neither Ronald Dean nor Nedra Dean ever instructed or requested that she not communicate with or withhold any information from John Lester.

Constance Lumpkin was the Director of Business Development at SDI from 2010 through 2015. Ms. Lumpkin testified credibly that throughout the entire time she worked at SDI, she never saw John Lester contribute in any meaningful way to SDI. Ms. Lumplin also testified credibly that neither Nedra Dean nor Ronald Dean ever instructed or requested that she not communicate with or withhold any information from John Lester.

Sandra Walker worked for SDI from 2008 through 2015. While working at SDI, Ms. Walker served as a project manager and worked in human resources, accounting, and payroll. Prior to joining SDI, Ms. Walker had a distinguished career in the United States Air Force from

---

[31] Clarissa Morris and Bradley Morris were married in 2013 in a ceremony performed by Ronald Dean.

1993 until 2001. While serving in the United States Air Force, Ms. Walker held a security clearance as her duties included, in part, scheduling many flights for presidential cabinet members, members of congress, and the First Lady. Ms. Walker also testified that throughout the entire time she worked for SDI, John Lester was not intimately involved with SDI. She also testified that on the handful of occasions that she did try to contact John Lester, it was frustrating "because I wouldn't be able to contact him."[32] Ms. Walker also testified credibly that neither Nedra Dean nor Ronald Dean ever instructed or requested that she not communicate with or withhold any information from John Lester. Ms. Walker also went to the Dallas office in September or October 2012 to box up some files and records to send from Dallas to Maryland.[33] John Lester and Ms. Patsy were in the office and they chatted with Ms. Walker during this visit. John Lester did not protest or ask why she was boxing up certain of SDI's records.

Cheryl Long worked for SDI from January 2013 through 2014. Prior to joining SDI, Ms. Long was employed by the United States Department of State, where she held a top-secret clearance as a community liaison officer and then promoted to a political assistant. At SDI, Ms. Long served as a project manager on the contract with Walter Reed National Military Medical Center in Bethesda, Maryland ("**Walter Reed**"). The Walter Reed contract was SDI's largest and most lucrative contract in its history. SDI had responsibility to staff over thirty different departments throughout Walter Reed. Ms. Long testified that throughout the entire time she worked for SDI, she had never met nor interacted with John Lester. She further testified that John

---

[32] Adv. No. 16-4147, ECF No. 158, 4/25/18 Trial Transcript at 34.

[33] *Id.* at 88. Nedra Dean, throughout the trial, complained mightily about alleged fake invoices that she discovered after reviewing the transferred files. Despite all the time she spent on this issue, she never "connected the dots" to show how that evidence was relevant to her claims or her defense against the Lester & SDI Claims. The Court's best educated guess, however, is that Nedra Dean is alleging that John Lester was manufacturing fake invoices to somehow harm SDI. As explained below, Nedra Dean does not have standing to pursue SDI's alleged claims against John Lester.

Lester was never involved with the Walter Reed contract and she, too, could not identify John Lester in the courtroom.  Ms. Long also testified credibly that neither Nedra Dean nor Ronald Dean ever instructed or requested that she not communicate with or withhold any information from John Lester.

SDI employed Luis Figueroa from 2013 through 2014, but as noted below, Mr. Figueroa worked closely with Ms. Long and SDI on the Walter Reed contract beginning in 2012.  Mr. Figueroa obtained a bachelor's degree in management studies and a master's degree in human resources.  Prior to joining SDI, Exhibit Arts employed him as an administrative assistant and then as an assistant program manager.  Exhibit Arts was the company that held the Walter Reed staffing contract before SDI won the Walter Reed contract in 2012.   After SDI won the Walter Reed contract in 2012, Exhibit Arts subcontracted with SDI to perform some duties for the Walter Reed contract.  While Mr. Figueroa worked for Exhibit Arts, he also worked closely with SDI and Ms. Long in particular.  When SDI was under-bid for the Walter Reed contract in October 2013, SDI hired Mr. Figueroa to work in accounting and human resources.  His duties at SDI included processing accounts receivable and accounts payable, in-processing new employees, and sending accounts receivable invoices.  Mr. Figueroa testified that he interacted with John Lester only a couple of times and that he had never personally met John Lester.  He further testified that John Lester was never involved with the Walter Reed contract and he never observed John Lester actively participating in SDI's business.[34]  Mr. Figueroa also testified credibly that he never recalled Nedra Dean or Ronald Dean instructing or requesting that he not communicate with or withhold any information from John Lester.  But on at least one occasion, Mr. Figueroa testified

---

[34] Although John Lester can point to certain emails in the record to show he was working at times, the overwhelming evidence supports Nedra Dean's claims that he had largely abandoned his management duties.

13

that he did refuse to provide John Lester with SDI financial documentation from QuickBooks because he did not know who John Lester was, and he was not comfortable providing such information to someone with whom he was not familiar.[35]  Mr. Figueroa testified credibly that his refusal to provide such information to John Lester was on his own accord and not pursuant to instructions from Nedra Dean or Ronald Dean.[36]

**D.    Disputes between John Lester and the Deans develop in 2012**

Beginning in the summer of 2012, disputes and disagreements between John Lester and the Deans began to develop and accelerated quickly.  Many of the disagreements constitute the basis of the general and specific allegations asserted by and between the parties in the Liquidation Complaint and Discharge Complaint.  The Court will address those allegations and claims below.

## IV.  ANALYSIS

**A.    The Lester & SDI Claims against Nedra Dean in the Liquidation Complaint**

The Court first will address the Lester & SDI Claims against Nedra Dean.  John Lester and/or SDI assert eight causes of action against Nedra Dean in the Liquidation Complaint.[37]

### 1. _First Count:  Violating John Lester's Statutory Right to Manage and Perform his Management Duties_

John Lester makes eleven allegations in support of his claim that Nedra Dean prevented him from performing his duties under the Operating Agreement and violated his statutory and contractual right to manage SDI.

---

[35] *See* Adv. No. 16-4147, ECF No. 165, 5/14/18 Trial Transcript at 278-279 (Luis Figueroa testimony).
[36] *Id.* at 280, 283-284.
[37] Adv. No. 17-4004, ECF No. 11.

a)      *Allegation:  In August 2012, Nedra Dean and Ronald Dean specifically instructed all employees working in SDI's Frederick, Maryland office to both stop communications with Lester and stop providing Lester information regarding SDI's business dealings or the employees would face dire consequences, i.e., termination.*

There is no credible evidence to support this allegation.  As previously noted, many former employees from SDI's Frederick, Maryland office credibly testified that neither Nedra Dean nor Ronald Dean instructed any of them to stop communicating with or to withhold information from John Lester.  There is no credible evidence to corroborate John Lester's allegation.

b)      *Allegation:  During August 2012, Dean deactivated Lester's SDI email account.  Accordingly, Lester has been unable to receive or send e-mail communications from his official SDI e-mail account.*

There is no credible evidence to support this allegation.  John Lester testified that in August 2012, Nedra Dean "cut off my company email, john@staffingtheglobe"[38] and that Nedra Dean "took away my email access, the company email account . . . she had the passwords, codes to get in the system.  So she says, well, you have been using some other – the other email account for a while.  You need to go back to using that one."[39]

Contrary to John Lester's testimony, the credible evidence established that John Lester's company email account had not been deactivated.  Rather, the evidence established that Laurie Aldridge was the SDI employee responsible for setting-up SDI's email accounts and maintaining all email account passwords.[40]  In addition, Ms. Aldridge admitted during cross-examination that in August 2012, she surreptitiously gave all the SDI email account passwords to John Lester's administrative assistant, Patsy Curtis.[41]

---

[38] Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 59.

[39] Adv. No. 16-4147, ECF No. 156, 4/23/18 Trial Transcript at 70.

[40] *See generally* Adv. No. 16-4147, ECF No. 144, 3/7/18 Trial Transcript at 112-17 (Laurie Aldridge testimony).

[41] *Id*. at 114.

Further, Sandra Walker credibly testified that Nedra Dean properly instructed all SDI's employees to use only SDI's secure business email accounts rather than unsecure personal email accounts.   This instruction came after Nedra Dean discovered that an SDI employee was automatically forwarding all of her SDI business emails to her personal email account. Ms. Walker testified that Nedra Dean "was really leery about that," and as a result, Nedra Dean prudently instructed everyone to start using "our business email versus the personal emails and not to have any personal emails with Staffing Dynamics information in it."[42]   In addition, Ms. Walker testified that Nedra Dean sent an email to staff specifically asking that they "email [John Lester] at john@staffingtheglobe and not to email him at his personal email."[43]  Ms. Walker further testified that she remembered "[Nedra Dean] asking John to use his company email."[44]   The evidence is replete with exhibits that confirm John Lester was receiving and sending SDI related emails throughout 2012-2015 at both his unsecure personal email account and his SDI business email account.

> c)    *Allegation:  During the same time period [August 2012], without notice or Lester's consent, Dean made unilateral decisions to terminate key personnel in SDI's principal office located in Dallas, Texas, where Lester worked.  She also terminated employees in SDI's Frederick, Maryland office where Dean worked; again without first discussing the decision with Lester or obtaining his approval.*

This allegation has no merit.  John Lester testified that in August 2012, Nedra and Ronald Dean "terminated two employees, two of the three employees that we had in the . . . SDI Dallas, Texas office, that being our accountant technician and our administrative/assistant bookkeeping

---

[42] Adv. No. 16-4147, ECF No. 158, 4/25/18 Trial Transcript at 36 (Sandra Walker testimony).

[43] *Id.* at 32-33.

[44] *Id.* at 33.

person."[45] John Lester further testified that Nedra and Ronald Dean wrongfully terminated Laurie Aldridge in the Frederick, Maryland office "for reportedly allegedly trying to set up a competing business against SDI."[46]

The credible evidence, however, reveals that Ronald Dean (i) had the authority as Chief Operating Officer to terminate underperforming employees;[47] (ii) gave each of the terminated employees advanced notice of their poor work performance with an opportunity to rectify their poor work performance;[48] and (iii) provided John Lester with advance notice of the terminations.[49] In addition, Ronald Dean specifically testified the he, and not Nedra Dean, terminated the two Dallas employees.[50] This uncontroverted testimony is important because even if the terminations were somehow improper (and to be clear, the Court does not find that the terminations by Ronald Dean were improper); there is no credible evidence in the record that Nedra Dean, the defendant in this case, terminated either of the two Dallas SDI employees. Further, the evidence suggests that John Lester did not believe the terminations were improper by his actions and subsequent acquiescence.[51] Finally, even if Nedra Dean had wrongfully terminated the SDI employees, John Lester and SDI failed to establish or prove any damages resulting from the asserted breach.

---

[45] Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 60. The third employee in Dallas was Patsy Curtis, who continued to work for SDI.

[46] *Id.* at 84.

[47] The firing of employees does not constitute a "Major Decision" subject to Section 3.02 of the Operating Agreement.

[48] *See* Adv. No. 16-4147, ECF No. 157, 4/24/18 Trial Transcript at 170 (Ronald Dean testimony: "I gave them a letter of reprimand and I gave them 30 to 60 days to get their act together. And the reason they were fired was because we almost lost the Indian Health contract simply because they didn't follow your instructions for credentialing.").

[49] *See id.* at 169-70 (Ronald Dean testimony: "[John Lester] said, Ron, I think you need to warn Patsy and Laurie before you fire them . . . Before you fire them. Well, I warned them.").

[50] *See* Adv. No. 16-4147, ECF No. 163, 5/16/18 Trial Transcript at 14 (Ronald Dean testimony).

[51] *See id.* at 16-17 (Ronald Dean testimony: "Q. So John Lester was involved. He knew that there was a layoff. And then John Lester is the one, he knew of your concerns about the Dallas employees. He told you before you fired them, or terminated them, to be sure to put something in writing; is that correct? A. He certainly did. Q. Then after the

17

> d) *Allegation: On or about January 31, 2013, Dean with the assistance of her husband, Ronald Dean, unilaterally shut down SDI's principal place of business located in Dallas, Texas. Without notice or Lester's consent, the Deans removed all furniture, fixtures, files, and equipment, including the computers, as well as Lester's SDI files.*

This allegation has no merit. John Lester unpersuasively testified, with no other credible corroborating evidence, that "[Nedra Dean] closed the Dallas, the SDI Dallas office without any discussion or notice to me and removed all of the assets, removed everything, the computers, the files. My computer, my files. Everything in that office, she moved."[52]

The overwhelming credible evidence contradicts John Lester's version concerning the closure of SDI's Dallas office. Lisa Love credibly testified[53] that she and Nedra Dean made an unannounced visit to the SDI Dallas office in January 2013. When they arrived at the SDI Dallas office, no SDI employees were in the office. They also discovered that the telephone lines were disconnected, the refrigerator in the lunchroom was unplugged, and the last message recorded on the receptionist's message pad was dated several months earlier. They also confirmed with building security that no one had been in the office for months.

Finally, John Lester's own exhibits contradict his testimony. For example, in response to a complaint by an outside auditor that John Lester was non-responsive to her request to schedule a Workers Compensation premium audit, John Lester justified his failure to respond by stating, "the Dallas office was closed and inaccessible via phone, etc., by the target date." [54] The target

---

terminations occurred, did Mr. Lester then take you to dinner? A. He did, yes . . . He didn't refute what had occurred, nor did he challenge it").

[52] *See* Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 63 (John Lester testimony).

[53] *See generally* Adv. No. 16-4147, ECF No. 165, 5/14/18 Trial Transcript at 40-46 (Lisa Love testimony).

[54] *See* Pls.' Ex. 136 at 1-2.

18

date referenced in John Lester's email was prior to the date Nedra Dean and Lisa Love discovered John Lester had abandoned the office.

Although the evidence suggests that John Lester had abandoned the SDI Dallas office sometime in 2012, SDI files remained in the unoccupied office space in unlocked file drawers in January 2013. Such unsecured files included highly confidential SDI business and financial records, as well as sensitive and confidential employee records including social security numbers, HIPPA related information, resumes, and confidential federal government documents.

Upon discovering that furniture, equipment, and confidential and sensitive SDI files had been left in an unsecured and unoccupied office space, Nedra Dean made immediate arrangements to transfer the furniture, equipment, and records to a secure location in Maryland. John Lester's actions regarding the SDI files were reckless and irresponsible. On the other hand, Nedra Dean's actions to secure the sensitive and confidential files were prudent and justified. Finally, even if Nedra Dean had wrongfully closed the Dallas, Texas office and wrongfully removed the records, equipment, and furniture, John Lester and SDI failed to establish or prove any damages resulting from the asserted breach.

> e) *Allegation: More importantly, on or about January 31, 2013, without Lester's knowledge or consent, Dean transferred 99% of SDI's funds to separate bank accounts, which do not require Lester's signature. Further, Lester neither has access to, nor does he receive notifications regarding the activity on these accounts. These unauthorized bank accounts are numbered: 1492010531; 7404164019; and 6176108212, all with Wells Fargo Bank, N.A.*

This allegation has no merit. John Lester testified that—

in January of 2013, [Nedra Dean] took over $400,000 from our duly-authorized dual-signatory bank account from Bank of America, where she and I were the dual signatories on. Unbeknownst to me, she took the funds and she took them and moved them to a bank, which I didn't know where they were. I didn't have access. I didn't have signatory control. I did not approve the removal of those funds to

wherever they were at the time. I was able to find out later where they were. And I was not allowed access or signatory on those accounts until the temporary injunction order of December 17, 2014. So, from January 2013 to December 17, 2014.[55]

The evidence established that on January 31, 2013, the Bank of America account ending in 9751[56] had a balance of $402,577.50. That Bank of America account was then closed, and the funds were deposited into Wells Fargo account ending in 8212.[57] A few weeks later, Wells Fargo changed the account ending in 8212 to a new number ending in 0531.[58] Shea Dersham, a regional bank premier banker for Wells Fargo, testified that the transfer from 8212 to 0531 was necessary due to a Wells Fargo error categorized as a "lost/stolen transfer."[59]

Furthermore, Nedra Dean's actions regarding bank accounts do not fall within the mandates of Section 3.02 of the Operating Agreement, which requires that all members approve "Major Decisions." Rather, bank account related actions fall squarely within Section 3.01(ix) of the Operating Agreement, which specifically authorizes any manager of SDI "to open and maintain bank accounts on behalf of the Company."[60] Therefore, Nedra Dean, as a manager of SDI, was authorized to open and maintain the Wells Fargo bank accounts on behalf of SDI. In addition, there is no provision in the Operating Agreement requiring John Lester's approval to open an SDI bank account or that he be given dual-signatory authority for SDI bank accounts. Moreover, John Lester now has control of SDI and its bank accounts. Finally, even if such approval and dual-

---

[55] Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 62 (John Lester testimony).

[56] *See* Def.'s Ex. TT at 16.

[57] *See* Def.'s Ex. KK; *see also* Adv. No. 16-4147, ECF No. 163, 5/16/18 Trial Transcript at 19 (Ronald Dean testimony).

[58] *See* Def.'s Exs. KK, PP.

[59] *See* Adv. No. 16-4147, ECF No. 166, 5/15/18 Trial Transcript at 127 (Shea Dersham testimony). A "lost/stolen transfer" occurs, for example, when a customer's account number becomes compromised. The customer is provided with a new account number, but the account includes the transaction history from the prior account number. *Id.* at 106.

[60] *See* Pls.' Ex. 3, § 3.01(ix).

signatory requirement existed, there is no credible evidence that Nedra Dean benefitted, or that John Lester or SDI suffered damages, from any alleged misconduct by Nedra Dean.

> f) *Allegation: In or about July 2013, Nedra Dean and Ronald Dean unilaterally made the decision to work with their accountant, Melinda Sechler ("Sechler"), to audit SDI's books and prepare and file tax returns on SDI's behalf. Prior to retaining Sechler, Dean did not discuss her decision to audit SDI's books with Lester, who is identified under the Operating Agreement as the Tax Matters Partner and the only Manager who had the authority to handle SDI's tax matters.*

These allegations have no merit. John Lester's own testimony and exhibits contradict this allegation. John Lester testified, "I came down and interviewed CPA Sechler. And I deemed her to be okay, and we did engage her to prepare our 2010 tax returns."[61] Moreover, Ms. Sechler continued to work on various engagements on behalf of SDI with John Lester's knowledge, approval, and participation from 2010 through early 2013.[62] Finally, there is no evidence in the record remotely supporting this allegation. To allege that Nedra and Ronald Dean "unilaterally made the decision to work with their accountant, Melinda Sechler" belies the overwhelming evidence in the record to the contrary, and it (together with his unbelievable testimony on other issues) undermines John Lester's overall credibility. Finally, even if there were a scintilla of evidence to support this allegation, there is no credible evidence in the record that Nedra Dean benefitted, or that John Lester or SDI suffered damages, from any such alleged misconduct by Nedra Dean.

---

[61] Adv. No. 16-4147, ECF No. 148, 3/26/18 Trial Transcript at 338.

[62] *See* Def.'s Ex. GGG; Pls.' Exs. 141, 145, 147, 148; *see also* Adv. No. 16-4147, ECF No. 149, 3/27/18 Trial Transcript at 29-30 (John Lester testimony that Ms. Sechler prepared a chart of accounts for SDI, prepared the SDI's tax returns, and she helped formulate and prepare the QuickBooks system in 2011 and 2012); *see also* Def.'s Ex. G at 11 (deposition transcript of Ms. Sechler, reflecting she did work for SDI from 2010 until sometime in 2013).

> g)  *Allegation: Upon information and belief, on or about July 2013, Dean filed a false and incorrect tax return on SDI's behalf. Further, upon information and belief, Dean expended SDI funds to pay Sechler for her services.*

This allegation has no merit. There is not a shred of credible evidence in the record to support this allegation of wrongdoing. As noted above, the credible evidence reflects that SDI, with the knowledge and approval of John Lester, engaged Ms. Sechler to prepare and file tax returns on behalf of SDI. Although there was passing testimony by John Lester that SDI's federal tax returns for 2012, 2013, 2014, and 2015 have been or may need to be amended, there was no evidence in the record that Nedra Dean was responsible for having filed a false or incorrect tax return on SDI's behalf. Furthermore, even if SDI did make payments to Ms. Sechler, the overwhelming credible evidence shows that SDI engaged Ms. Sechler to perform tax and accounting services on behalf of SDI. Finally, there is no credible evidence in the record that Nedra Dean benefitted, or that John Lester or SDI suffered damages, from any such alleged misconduct by Nedra Dean.

> h)  *Allegation: Shortly thereafter, Lester requested a copy of the tax return and the financial information used to create said return, however, Dean refused to provide the information.*

There is no credible evidence to support this allegation. Even if there were a scintilla of evidence to support this allegation, there is no credible evidence in the record that Nedra Dean benefitted, or that John Lester or SDI suffered damages, from any such alleged misconduct by Nedra Dean.

> i) Allegation: Upon information and belief, Dean filed incorrect tax returns and provided the same erroneous data to the SBA in connection with SDI's Annual Report submitted in January 2014, and may file an erroneous Annual Report in January 2015.

There is no credible evidence to support this allegation. Moreover, there is no credible evidence in the record that Nedra Dean benefitted, or that John Lester or SDI suffered damages, from any such alleged misconduct by Nedra Dean.

> j) Allegation: Upon information and belief, from 2011 to the present, Dean and Ronald Dean have used SDI assets for their personal use, including but not limited to, the use of the company's credit cards to pay for items such as groceries, dry cleaning, meals, car repair, and non-SDI related travel. The Deans have failed to reimburse the company for these personal expenses. This also violates the eligibility requirements under the SBA Program.

The Court will address these allegations in more detail in section IV.A.3 below regarding alleged breaches of fiduciary duties.

> k) Allegation: Upon information and belief, Dean has not informed the SBA of the following actions: (1) ousting Lester from SDI; (2) expanding her husband's role in managing and asserting control over SDI, or (3) filing a lawsuit against Lester and former employees of SDI. All of Dean's actions directly impact SDI's ability to maintain its SBA Certification and retain federal contracts for healthcare personnel worth millions of dollars.

These allegations have no merit. As detailed above, Nedra Dean never ousted John Lester from SDI. Instead, the overwhelming evidence supports the conclusion that John Lester largely abandoned his duties, and the Deans—except as specifically noted in this Opinion—did what they could to make SDI succeed. Ronald Dean properly exercised the authority John Lester and Nedra Dean gave him as Chief Operating Officer. There is no credible evidence that Nedra Dean did not inform the SBA properly regarding SDI's affairs or that John Lester or SDI suffered damages as a result of Nedra Dean's state court lawsuit against Lester that she dismissed voluntarily. The Court

will discuss these issues in greater detail below when analyzing John Lester's and SDI's §
523(a)(6) claims, but the evidence established that SDI's loss of contracts and 8(a) SBA
certification resulted from SDI's failing business, mutual personal animosity between the parties,
and from competition in the market-place when bidding on contracts, rather than from any
unauthorized or unilateral actions taken by Nedra Dean.

### 2. *Second Count: Breach of Contract*

John Lester and SDI next assert breach-of-contract claims against Nedra Dean. "Under
Texas law, a party asserting breach of contract must prove: (1) the existence of a valid contract;
(2) that the [party] performed or tendered performance; (3) that the other party breached the
contract; and (4) that the party was damaged as a result of the breach."[63]

John Lester and SDI allege that Nedra Dean breached the Major Decision Clause of the
Operating Agreement in numerous ways.

> a) *Allegation: Nedra Dean made a unilateral decision in August 2012 to shut off Lester's access to his SDI email account.*

For the same reasons described above, this allegation has no merit.

> b) *Allegation: Nedra Dean altered and concealed SDI's financial books and records without Lester's knowledge and consent.*

For the same reasons described above, this allegation has no merit. To the extent John
Lester is complaining of other alleged altering and concealing of records not already discussed
above, the Court finds no credible evidence to support such allegations.

> c) *Allegation: Nedra Dean usurped Lester's role as the Tax Matters Partner by excluding him from the handling and preparation of SDI's 2012 and 2013 tax returns.*

For the same reasons described above, this allegation has no merit.

---

[63] *City of Dallas v. Delta Airlines, Inc.*, 847 F.3d 279, 289 (5th Cir. 2017).

> d) *Allegation: Nedra Dean closed SDI's principal office in Dallas, Texas and moved all the fixtures, furniture, and files to SDI's office in Fredrick, Maryland.*

For the same reasons described above, this allegation has no merit.

> e) *Allegation: Nedra Dean instructed employees and SDI's CPA not to speak or communicate with Lester about SDI business matters.*

For the same reasons described above, this allegation has no merit.

> f) *Allegation: Nedra Dean withdrew SDI funds from company bank accounts and deposited into a new accounts that Lester could not access.*

For the same reasons described above, this allegation has no merit.

> g) *Allegation: Nedra Dean terminated key personnel in SDI's principal office located in Dallas.*

For the same reasons described above, this allegation has no merit.

> h) *Allegation: Nedra Dean took over the accounting practices and tax related matters of SDI in 2012 and 2013.*

For the same reasons described above, this allegation has no merit.

> i) *Allegation: Nedra Dean terminated key personnel in Maryland office.*

For the same reasons described above, this allegation has no merit.

> j) *Allegation: Nedra Dean used SDI's assets for her and her husband's personal gain.*

The Court will address these allegations in more detail in section IV.A.3 below regarding alleged breaches of fiduciary duties.

> k)  *Allegation:  Nedra Dean made expenditures outside of SDI's approved budget and without Lester's knowledge or approval.*

This allegation appears to be a restatement of allegation j), above.  The Court will address these allegations in more detail in section IV.A.3 below regarding alleged breaches of fiduciary duties.

### 3.  *Third Count: Breach of fiduciary duty*

John Lester and SDI next assert breach-of-fiduciary-duty claims against Nedra Dean.  As a preliminary matter, Nedra Dean did not formally concede that she owed a fiduciary duty to a fellow SDI member (John Lester), as opposed to the unquestionable fiduciary duty she owed to SDI.  John Lester did not plead or prove an informal fiduciary relationship between John Lester and Nedra Dean to support a finding that Nedra Dean owed him a fiduciary duty.[64]

Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages.[65]  Although the Texas Supreme Court has recognized that a plaintiff may not need to prove actual damages when seeking equitable relief, the court has reaffirmed that a plaintiff must show causation and actual damages when asserting a claim for the loss of money.[66]  In their breach-of-fiduciary-duty count, John Lester and SDI allege, "As a proximate result of Lester's breach of fiduciary duty, Lester and SDI have suffered economic harm in an amount to be proven at trial."[67]  John Lester and SDI also seek

---

[64] *See Fed. Ins. Co. v. Rodman*, 2011 WL 5921529 (N.D. Tex. Nov. 29, 2011) (stating that there is no formal fiduciary relationship created as a matter of law between members of an LLC, but recognizing that an informal fiduciary relationship may arise under particular circumstances where there is a close, personal relationship of trust and confidence).

[65] *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

[66] *See Id.* at 221.

[67] *Liquidation Complaint*, Adv. No. 17-4004, ECF No. 11 ¶ 35.

to have this economic claim declared nondischargeable, as discussed below. Therefore, John Lester and SDI must prove damages to support their breach-of-fiduciary-duty claims.

John Lester and SDI allege that Nedra Dean breached her duties of care, honesty, undivided loyalty, and fidelity[68] by "her self-dealing and usurping business opportunities as described herein, including, but not limited to those acts of self-dealing designed to divert business opportunities away from SDI to Dean and her family."[69] John Lester and SDI do not specify the alleged breaches of fiduciary duty, but the Court assumes that John Lester and SDI are referring to the same self-dealing allegations covered above with respect violations of John Lester's right to manage and perform his management duties, and breaches of contract. The Court already addressed most of those allegations and found they had no merit.

The Court next will address the Consultant's Report of Lori K. Orta,[70] and the Nations Professional Staffing Services transfer of the MTC Medical contract[71] to RL Dean and Associates, LLC.

a)    <em>Consultant's Report</em>

On September 17, 2015, before the Liquidation Complaint was removed to this Court, the state court entered an order granting John Lester's unopposed motion to appoint Lori K. Orta as an independent auditor to "(a) Conduct a forensic audit and accounting of SDI for the years 2012, 2013, and 2014; and (b) Determine a present valuation of SDI taking into account any necessary

---

[68] *Id.* ¶ 33.

[69] *Id.* ¶ 34.

[70] Plaintiffs refer to Ms. Orta's report and findings in their Discharge Complaint, but they do not mention her report or findings in their Liquidation Complaint. Nevertheless, the Court will discuss her report here first because it addresses the Liquidation Complaint allegations that Nedra Dean used SDI's assets for her and her husband's personal gain, including expenditures that Lester allegedly did not authorize.

[71] Pls.' Exs. 70, 71, and 197.

credits or off-sets for either Lester or Dean that may be discovered in the audit for years 2012, 2013 and 2015."[72]

Ms. Orta completed her Consultant's Report on December 3, 2016, after Nedra Dean's bankruptcy petition date.[73]   According to John Lester and SDI, "Pursuant to the Audit Report. . . the Defendant misappropriated Lester and SDI's assets for personal use and personal gain."[74]   The Consultant's Report is not so absolute, however.  The report notes that Ms. Orta was "not engaged to and did not conduct a review of compliance matters of SDI LLC's business operations, internal controls over financial reporting or accounting office operations."[75]   Moreover, in many instances, Ms. Orta recommended follow up investigation regarding the propriety of the noted transactions. Finally, for reasons that the parties and Ms. Orta dispute, Nedra Dean did not receive a draft of the report for review and comment on the questioned transactions, and the parties contest whether Ms. Orta reviewed several boxes of "source documents" that Nedra Dean gave Ms. Orta for her investigation.  Although the Court rejects Nedra Dean's allegations that Ms. Orta fraudulently conspired with John Lester to produce the report, the Consultant's Report itself is less than thorough and complete.

In support of their claims, John Lester and SDI highlight a number of matters described in the Consultant's Report.  The Court addresses these items in turn, starting with items where the Consultant's Report found no adverse effect on either party's capital account, even though John Lester and SDI spent significant time at trial complaining about them.

---

[72] Pls.' Ex. 14.

[73] Pls.' Ex. 16.

[74] *Pretrial Brief of Plaintiff John P. Lester* at 6, Adv. No. 16-4147, ECF No. 58.

[75] *Consultant's Report*, Pls.' Ex. 16 at 1.

(1)   Finding of ***no effect*** on Nedra Dean's capital account:
Cashier's checks to buy a house

According to the Consultant's Report—

In October 2013, a branch withdrawal in the amount of $300,000 was made. Upon inquiry of Dean and Lester, Ms. Dean indicated this was to purchase an SDI owned office. Receipt of subsequent support indicated the withdrawal was used to acquire cashier checks in the amount of $100,000 and $200,000 payable to Prosperity Financial (a mortgage company related to Ms. Dean's sister). A copy of a contract was received from Ms. Dean referencing the funds to be held at Prosperity Financial. The name on the contract was R. Dean and N. Dean for a house in Maryland with a contract price of $1,050,000. In November 2013, the unused cashier checks were deposited back into SDI's account and endorsed by N. Dean as not used for purpose intended.

. . . .

The funds came back into SDI's account and therefore no net impact to the capital account.[76]

The parties dispute whether Nedra and Ronald Dean intended to purchase the house for purely personal use or instead as a "dual-use" home and office given SDI's need for office space in Maryland. It is undisputed that on October 12, 2013, Nedra Dean withdrew $300,000 from Wells Fargo account 0531[77] with two cashier's checks.[78] Then, on November 8, 2013, Nedra Dean deposited the two cashier's checks back into Wells Fargo account 0531.[79] In the end, regardless of Nedra and Ronald Dean's original intent regarding the anticipated use of the $300,000, the Consultant's Report found no net impact on Nedra Dean's capital account, and there

---

[76] *Consultant's Report*, Pls.' Ex. 16 at 5 & Schedule III.

[77] Pls.' Ex. 191; Def.'s Ex. Q.

[78] Pls.' Exs. 189, 190.

[79] Pls.' Ex. 192, Def.'s Ex. R at 2.

is no credible evidence of any damages suffered by John Lester or SDI from this failed transaction.[80]

    (2)    Finding of ***no effect*** on Nedra Dean's capital account: October 2014 transfer of $6996.40

According to the Consultant's Report, "On October 8, 2014, a deposit totaling $6,996.40 comprised of checks payable to SDI was deposited into R L. Dean and Associates account #9629. On October 28, 2014, an electronic transfer of $6,996.40 to account #0531 came in from account #9629 to properly deposit the funds into an SDI account."[81]

Ronald Dean testified that he attempted to deposit the checks into an SDI account, but the Wells Fargo teller mistakenly deposited the funds into an R.L. Dean bank account, a recurring mistake Ronald Dean attributed to his name being associated with both the SDI bank account and the R.L. Dean account.[82] According to Ronald Dean's credible testimony, when he noticed this mistake, he immediately returned the funds to SDI. The Consultant's Report notes no adverse effect on Nedra Dean's capital account from this transaction, and there is no credible evidence of damages suffered by John Lester or SDI from this transaction.

    (3)    ***No finding*** regarding an effect on Nedra Dean's capital account: Credit card charges

According to the Consultant's Report, there were $290,250 in credit card charges that "were not substantiated with receipts to support [SDI] business purpose" and that "could be taken back against the capital account of the respective shareholders" who made the charges.[83] The

---

[80] As noted below, Mr. Tannery's expert report and testimony were not credible or persuasive. In addition, Wells Fargo account 0531 was a non-interesting bearing account, so SDI did not lose any interest income for the twenty-seven days the funds were outstanding in the form of the cashier's checks. *See* Def.'s Exs. Q, R.

[81] *Consultant's Report*, Pls.' Ex. 16 at 3.

[82] Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 202; Adv. No. 16-4147, ECF No. 163, 5/16/18 Trial Transcript at 80-82.

[83] *Consultant's Report*, Pls.' Ex. 16 at 5 & Schedule II.

Consultant's Report identified (generically, without specifics) $273,500 in charges made by Nedra or Ronald Dean, but the Consultant's Report did not adjust Nedra Dean's capital account; instead, Ms. Orta "recommend[ed] SDI work with its external CPA to determine next appropriate steps for substantiation of credit card charges as business expenses and appropriate[ly] charge each shareholder for unsubstantiated expenses."[84] John Lester and SDI appear to have narrowed their claims from $273,500 to only $75,000.[85] Neither John Lester nor SDI offered any proof of the specific $75,000 in credit card charges that "possibly" could have been Nedra Dean's personal charges.

Although their testimony was general and did not cover specific charges (which is not surprising, since neither John Lester nor SDI offered evidence of any specific charges they contest), Nedra Dean and Ronald Dean both testified that all the disputed credit card charges were for SDI business purposes and that neither of them ever stole from the company.[86] Nedra Dean also testified that Ms. Orta never contacted her to ask about specific credit card charges, and Ms. Orta never explained exactly which credit card charges were unsubstantiated. There is no credible evidence to contradict the Deans' testimony, and there is no credible evidence of any breach by Nedra Dean.

(4)    $6,390 adjustment to Nedra Dean's capital account

Next, the Consultant's Report concludes, "Ms. Dean's total shareholder distributions from

---

[84] *Id.* Schedule II.

[85] "And conservatively, although the auditor found that there were over 273,000 between the defendant and her husband in unsubstantiated credit card charges, we estimated that *possibly* 75,000 of those credit card charges would be personal in nature." Adv. No. 16-4147, ECF No. 175, 6/20/18 Trial Transcript at 27 (Plaintiffs' closing arguments) (emphasis added).

[86] *See, e.g.,* Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 167-69; Adv. No. 16-4147, ECF No. 157, 4/24/18 Trial Transcript at 225-26, 250; Adv. No. 16-4147, ECF No. 163, 5/16/18 Trial Transcript at 74; Adv. No. 16-4147, ECF No. 170, 5/22/18 Trial Transcript at 20-21, 170, 173, 176.

SDI exceeded Mr. Lester's shareholder distributions by approximately $421,000. See Capital Calculation Schedule II Ending Capital Balance for further details."[87] The Court now addresses the components of the $421,000.

First, Schedule II of the Consultant's Report makes a $6,390 adjustment to Nedra Dean's capital account "to properly reflect non-business expenditures to shareholder Dean."[88] The Consultant's Report does not explain what the expenditures are or when Nedra Dean allegedly made such expenditures. John Lester's and SDI's theory appears to be that if Ms. Orta adjusted Nedra Dean's capital account based on unequal distributions, Nedra Dean must have breached the Operating Agreement or breached a fiduciary duty or hampered John Lester's management rights. The Operating Agreement does not support this claim. Although the Agreement generally calls for distributions in accordance with the members' respective percentage interests (*i.e.*, 50/50),[89] the Operating Agreement also contemplates that prior interim, unequal distributions may need to be equalized using reserves created by SDI.[90] In other words, the Operating Agreement contemplates the possibility of unequal interim distributions, subject to later true-ups to equalize them. Moreover, given the apparent limited due diligence Ms. Orta performed when determining whether expenditures were SDI expenditures or Nedra Dean's personal expenditures, the Court cannot rely on her undetailed, unsubstantiated conclusion that these expenditures were Nedra Dean's personal expenditures. There is insufficient credible evidence to support a breach of any

---

[87] *Consultant's Report*, Pls.' Ex. 16 at 7. The Schedule II adjustments to Nedra Dean's capital account of $6,390, $90,460, $151,122, $24,412, and $151,188—discussed below—less a Schedule II $2500 adjustment to Lester's capital account, total $421,772. This calculation appears to be what the Consultant's Report is referring to when it states that Nedra Dean's distributions exceed Lester's distributions by "approximately" $421,000.

[88] *Consultant's Report*, Pls.' Ex. 16 at Schedule II.

[89] *Operating Agreement* §§ 2.04(a), (c), Pls.' Ex. 3.

[90] *Id.* § 3.03.

kind based solely on unequal distributions.[91]

(5)    $90,460 adjustment to Nedra Dean's capital account

Schedule II of the Consultant's Report makes a $90,460 adjustment to Nedra Dean's capital account based on "Distributions 2014 per tax return to shareholder Dean."[92] Ms. Orta elaborated in her testimony:

> The same thing, it walks down for the net loss that flows through individually, and it continues to walk down until there are other transactions that were distributions to the one shareholder that the other shareholder did not have. And you'll see those on the ending capital adjustment. That's the $90,460. So that's the point at which different, obviously, distributions in different capital accounts would start rolling forward, because one shareholder or member took more out of the company from a personal basis than the other member or shareholder did. So that's why those accounts are off-kilter before the adjustments.[93]

The K-1s attached to SDI's 2014 tax return reflect no distributions to Lester in 2014 and $90,460 in distributions to Nedra Dean in 2014.[94] That distribution appears to have been based in part on a $50,000 transfer from SDI's account to Nedra Dean's personal savings account on July 10, 2014.[95] SDI's draft tax return originally coded this payment as a distribution to John Lester, but James Kerich, SDI's CPA, corrected the return after John Lester notified him of the mistake.[96] Nedra Dean testified that she caused the $50,000 payment in 2014 because SDI had not paid her the $12,900 monthly payments that she and Ronald Dean had each been receiving.[97] It is not

---

[91] Even if unequal distributions, standing alone, could be considered a breach of the Operating Agreement, that unequal-distribution breach (as discussed below) would not suffice to make the debt nondischargeable.

[92] *Consultant's Report*, Pls.' Ex. 16 at Schedule II.

[93] Adv. No. 16-4147, ECF No. 144, 3/7/18 Trial Transcript at 166.

[94] Pls.' Ex. 43.

[95] *Consultant's Report*, Pls.' Ex. 16 at 3 & Schedule III.

[96] Adv. No. 16-4147, ECF No. 156, 4/23/18 Trial Transcript at 47-49 (Lester testimony).

[97] *See, e.g.*, Adv. No. 16-4147, ECF No. 165, 5/14/18 Trial Transcript at 21, 34; Adv. No. 16-4147, ECF No. 163, 5/16/18 Trial Transcript at 43, 82-83.

33

surprising that Nedra Dean thought she should be getting a salary for her work because SDI had been paying Nedra Dean and John Lester W-2 wages for 2012—when John Lester had control of "every dime" of SDI's money[98]—and 2013 (and perhaps even in prior years).[99] Ronald Dean also testified that SDI stopped making monthly payments to John Lester because he had abandoned his duties.[100] Again, it is not surprising that the Deans thought Lester should not get paid full compensation (salary or otherwise) given Lester's abandonment of his duties.

(6)    $151,122 adjustment to Nedra Dean's capital account

Schedule II of the Consultant's Report makes a $151,122 adjustment to Nedra Dean's capital account for "bank transactions" described in Schedle III of the report. Schedule III of the report contains numerous transactions that add up to $151,122.

(a)    *"Neck Tie Club Contribution" and other expenditures totaling $2,561.46.*

All but one of these Schedule III expenditures were in 2012, when John Lester appears to have controlled "every dime" of SDI's money.[101] There is little or no credible evidence that these expenditures were unauthorized. Moreover, with respect to the only expenditure discussed in detail, Nedra Dean testified that the $1,250 "Neck Tie Club Contribution" was not a personal purchase of neck ties by Ronald Dean as alleged by John Lester,[102] but instead a charitable contribution to a group of inter-city youth trying to better themselves with positive after-school

---

[98] Adv. No. 16-4147, ECF No. 157, 4/24/18 Trial Transcript at 191-92 (Ronald Dean testimony).

[99] Def.'s Ex. DDD.

[100] *See* Adv. No. 16-4147, ECF No. 163, 5/16/18 Trial Transcript at 43 (Court's interpretation of Ronald Dean testimony).

[101] Adv. No. 16-4147, ECF No. 157, 4/24/18 Trial Transcript at 191-92 (Ronald Dean testimony).

[102] Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 63 (John Lester); Adv. No. 16-4147, ECF No. 148, 3/26/18 Trial Transcript at 222 (John Lester).

activities and trying to get into college.[103] Nedra Dean also testified that it was part of SDI's business to make tithes or charitable contributions, and that SDI even contributed to Lester's church.[104] There is insufficient credible evidence to support a breach of any kind from these expenditures.

(b) *Bank counter withdrawals of cash totaling $14,932.96*

All but two of these Schedule III cash withdrawals from SDI's bank account occurred in 2012, when Lester appears to have controlled "every dime" of SDI's money.[105] There is little or no credible evidence that these cash withdrawals were unauthorized or that Lester was not aware of them. Two of the cash withdrawals, totaling $2,400, were in 2013, but given the Deans' testimony that everything they took out of SDI was for SDI's business purpose, and given the totality of the evidence showing that the Deans were doing everything they could to make SDI succeed, the Court finds and concludes that there is insufficient evidence to support a breach of any kind from these withdrawals.

(c) *3E Konsulting payments totaling $16,500*

According to the Consultant's Report, "[f]rom January 2013 to January 2014, checks were issued to . . . 3E Consulting for $16,500 for a consulting project not agreed to by both shareholders." Or about September 6, 2013, Nedra Dean, as president of SDI, engaged 3E

---

[103] Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 171-72 (Nedra Dean).

[104] *See* Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 170-71 (Nedra Dean Testimony). Ronald Dean also testified that SDI, through Lester, made several charitable contributions. *See* Adv. No. 16-4147, ECF No. 157, 4/24/18 Trial Transcript at 127-29.

[105] Adv. No. 16-4147, ECF No. 157, 4/24/18 Trial Transcript at 191-92 (Ronald Dean testimony).

Konsulting LLC to investigate possible workers compensation fraud by John Lester.[106]  The result of that investigation is contained in a report[107] that is irrelevant to the claims in this lawsuit because SDI would own any such claims against John Lester, and SDI is not pursuing them.

For purposes of this lawsuit, however, John Lester contends that because he did not consent to SDI's engagement of 3D Global Konsulting, any such fees paid to that firm by SDI were not appropriate and constitute a breach of fiduciary duty by Nedra Dean.  Nevertheless, given Nedra Dean's perception in 2013 that John Lester had effectively abandoned his management duties at SDI, and given the course of dealing generally between Nedra Dean and John Lester since SDI's inception, Nedra Dean reasonably believed that she had the managerial authority to retain 3E Global Konsulting on SDI's behalf to conduct such an investigation.  Further, by not timely opposing the retention of 3E Global Konsulting, John Lester effectively waived any right he may have had to argue that SDI's retention of 3E Global Konsulting was a "Major Decision" under the Operating Agreement, requiring John Lester's approval.  Finally, even if Nedra Dean's retention of the fraud investigator was not permissible under SDI's governing documents, she had a good-faith belief in her right to do so.[108]

(d)      *Charitable contributions totaling $10,326*

The Consultant's Report notes payments totaling $10,326 to Enloe Mortuary, International Community Church, Bunton Memorial CME, and Spencer Funeral Directors.  Ms. Orta testified that tithing and charitable contributions were not a corporate SDI expense and were therefore

---

[106] Def.'s Ex. P.

[107] *Id.*

[108] Her good-faith belief precludes a finding of nondischargeability, discussed below.

36

charged to the shareholder who wrote the check.[109] These payments appear to be charitable contributions, and Nedra Dean's credible testimony was that charitable contributions were part of SDI's business. Nedra Dean's testimony is corroborated by SDI's contribution, caused by John Lester, to John Lester's church, which the Consultant's Report charged against his capital account.[110] There is insufficient credible evidence to support a breach of any kind from these payments.

(e)    <em>Payments to Peebles Law Firm of $39,612.60</em>

The Consultant's Report charged $39,612.60 to Nedra Dean's capital account based on payments to Peebles Law Firm, which Ms. Orta concluded was the "personal attorney for N. Dean."[111] There is limited information in the record regarding this firm's work, but the available evidence suggests that the fees were paid to Peebles Law Firm in 2013 for a lawsuit suit filed by the firm on behalf of SDI and Nedra Dean in 2013 against John Lester and other defendants.[112] The vast majority of the claims asserted in that lawsuit appear to be SDI's derivative claims, so the evidence suggests that SDI made the payments to the Peebles Law Firm on SDI's behalf. Given Nedra Dean's perception that John Lester had breached his duties to SDI and had effectively abandoned his management duties at SDI, and given the course of dealing between Nedra Dean and John Lester since the inception of SDI, Nedra Dean reasonably believed that she had the managerial authority to retain Peebles Law Firm on behalf of SDI. There is insufficient credible evidence to support a breach of any kind by Nedra Dean for SDI's payments to Peebles Law Firm.

---

[109] *See* Adv. No. 16-4147, ECF No. 144, 3/7/18 Trial Transcript at 173.

[110] *Consultant's Report*, Pls.' Ex. 16 at Schedules II & III.

[111] *Consultant's Report*, Pls.' Ex. 16 at Schedule III.

[112] Def.'s Ex. O.

(f)     *Payments to Prosperity Mortgage totaling $6,920*

The Consultant's Report charged $6,920 to Nedra Dean's capital account based on two payments to Prosperity Mortgage, a mortgage broker company owned by Nedra Dean's sister, Lisa Love.[113]   The uncontroverted evidence, however, is that these payments were made by SDI to compensate Prosperity Mortgage for its assistance with a workers' compensation premium audit being performed on SDI during 2013 by ACE Group Premium Audit Processing.[114]   There is insufficient credible evidence to support a breach of any kind by Nedra Dean for the payments made by SDI to Prosperity Mortgage.

(g)     *Payment of $53,588.65 for Ronald Dean's personal taxes*

According to the Consultant's Report—

SDI funds were used to pay personal income taxes due to the Internal Revenue Service ("IRS") in the amount of $53,588.65.  Ms. Dean indicated in various communications this was an error by the IRS.  The payment was applied to Ronald Dean's social security number per documentation on the cancelled check endorsed by the IRS.  Upon further inquiry of the IRS by Lester, the IRS sent a letter to SDI indicating the check was accompanied by a payment stub from a letter they had issued to an individual showing a balance due for the exact amount of the payment received on an SDI company check.  Dean authorized contact of her personal CPA who also verified this was the amount due on Dean's personal return.

. . . .

The IRS is issuing a refund in the amount of $56,984.10, which includes $3,395.45 in interest.  For purposes of this report through 12-31-14 capital period, the charge has been included as a capital adjustment.  Upon receipt of the refund in 2016, the capital account can be adjusted.[115]

---

[113] *Consultant's Report*, Pls.' Ex. 16 at Schedule III.

[114] *See* Adv. No. 16-4147, ECF No. 165, 5/14/18 Trial Transcript at 84-85, 103, 110-11 (Lisa Love testimony); *see also* Pls.' Ex. 133.

[115] *Consultant's Report*, Pls.' Ex. 16 at 4 & Schedule III.

The parties dispute whether the Deans caused SDI to make this tax payment intentionally, or whether it was a mistake, either by the IRS or the Deans.[116] In the end, however, the IRS refunded the payment, with interest, to SDI.[117] There is no credible evidence of any damages from this transaction. Because there is no credible evidence of any damages resulting from this transaction, the Court need not determine if the tax payment was intentional or a mistake.

(h) *Gift payment of $5,500 to Laurie Aldridge*

The Consultant's Report charged $5,500 to Nedra Dean's capital account based on a $5,500 payment to Laurie Aldridge, "noted as a gift."[118] There is no evidence to support Ms. Orta's conclusion that this payment was a gift from Nedra Dean as opposed to a gift from SDI.[119] There is insufficient credible evidence to support a breach of any kind by Nedra Dean regarding this payment.

(i) *Miscellaneous retail charges of $694.27*

The final component of the $151,122 adjustment to Nedra Dean's capital account is a miscellaneous bucket of charges from 2013 totaling $694.27, including charges at retail establishments such as Taco Bell and one ATM withdrawal. Given the Deans' testimony that any SDI funds spent by either of them was only for SDI business purposes,[120] and given the totality of the evidence in this case about the efforts the Deans took to make SDI succeed, the Court finds

---

[116] Ronald Dean is not a defendant.

[117] *See* Pls.' Ex. 25.

[118] *Consultant's Report*, Pls.' Ex. 16 at Schedule III.

[119] The Court also notes that Ms. Aldridge testified on behalf of John Lester and against Nedra Dean, as previously noted in this Opinion.

[120] *See, e.g.,* Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 197-199 (Ronald Dean testimony); Adv. ECF No. 163, 5/16/18 Trial Transcript at 61, 74 (Ronald Dean testimony).

and concludes that there is insufficient credible evidence that these insignificant expenditures were improper or resulted in a breach of contract or breach of fiduciary duty by Nedra Dean.

(7)    $24,412 adjustment to Nedra Dean's capital account

Schedule II of the Consultant's Report makes a $24,412 adjustment to Nedra Dean's capital account for "payroll in excess of 50%-50%,"[121] which is described in Schedule IV of the report. Schedule IV of the report calculates the $24,412 based on "Payroll variance difference by which N. Dean salary exceeded J. Lester salary" in 2012-13.[122]

Whether unequal payments are described as distributions (which is what the Operating Agreement contemplates) or salary (a term used by the parties and Ms. Orta, and contemplated under the Limited Partnership Agreement), unequal distributions or payments, standing alone, are not sufficient credible evidence of a breach of contract or breach of fiduciary duty. As mentioned above, SDI (even when John Lester was in control of the money) paid Nedra Dean and John Lester W-2 wages in 2012 and 2013, seemingly in reliance on the Limited Partnership Agreement provisions that allowed compensation payments. Nedra Dean's conclusion that John Lester had abandoned his duties and effectively "checked out" of SDI's business is supported by both parties' actions in 2013, when there were serious negotiations regarding a buyout of John Lester's membership interest in SDI. There is simply not sufficient credible evidence to establish that payments of "payroll in excess of 50%-50%" were improper distributions. Further, even if such distributions technically violated the Operating Agreement, there is no credible evidence to establish that such distributions were the result of a breach of fiduciary duty by Nedra Dean.

---

[121] *Consultant's Report*, Pls.' Ex. 16 at Schedule II.

[122] *Consultant's Report*, Pls.' Ex. 16 at Schedule IV.

(8)    $151,888 adjustment to Nedra Dean's capital account

Finally, Schedule II of the Consultant's Report makes a $151,888 adjustment to Nedra Dean's capital account for "transactions payable to Dean and coded to Ronald Dean."  Schedule IV actually breaks the $151,888 adjustment into three components:  (i) a $4,245 adjustment in Nedra Dean's favor for a "manual check which was not located in a scan of the bank debits nor included in the $19,449 [manual checks already included in Schedule IV]"; (ii) $138,945 for "Difference checks [in 2013] coded to R. Dean or RL Dean and Associates but payable to N. Dean"; and (iii) $17,188 for 2014 "Cash withdrawals by N. Dean."[123]

Ms. Orta testified that the $138,945 adjustment was for "checks that cleared through the bank that were, within the QuickBooks system, noted as being checks to R.L. Dean or Ronald Dean & Associates but they were checks that were actually written to Nedra Dean."[124]  For the reasons already described, this unequal "distribution" (which appears to have been intended as partial W-2 compensation for Nedra Dean in 2013), standing alone, is insufficient evidence of a breach of contract or breach of fiduciary duty.

With respect to the $17,188 adjustment for "cash withdrawals," Ms. Orta testified as follows:

> Any of the transactions, as we tested all of the expenditures out of the bank, if those were counter withdrawals and they -- we traced those back into the financial records, and if they did not have a business purpose and they were coded basically to Miscellaneous Other, then there -- and there was no support that we located, then those were treated as counter withdrawals based on the person that took that withdrawal out.[125]

---

[123] *Consultant's Report*, Pls.' Ex. 16 at Schedule IV.

[124] Adv. No. 16-4147, ECF No. 144, 3/7/18 Trial Transcript at 176.

[125] *Id.* at 176-77.

Ms. Orta apparently never asked Nedra Dean about these counter withdrawals from the bank, and Nedra Dean did not specifically testify about them at trial. Nedra Dean did, however, credibly testify generally that she never stole from SDI,[126] and the Deans throughout the trial consistently took the position that the funds they received from SDI were for business purposes. Based on the totality of the circumstances—including the work that the Deans were doing in 2014 and the expenditures needed to make SDI succeed—the Court finds and concludes that there is insufficient credible evidence of a breach of contract or fiduciary duty by Nedra Dean based on these cash withdrawals.

b) *Transfer of the MTC Medical Contract*

According to John Lester and SDI—

> Prepetition, the Defendant operated a company doing business as Nations Professional Staffing Services ("Nations Staffing"). Nations Staffing had a revenue generating contract with MTC Medical (the "MTC Medical Contract"). In March 2015, the Defendant assigned Nations Staffing's interest in the MTC Medical Contract to her husband's firm R.L. Dean & Associates, LLC.[127]

There is insufficient evidence to show whether Nations Professional Staffing, as a company, was still in existence when the MTC Medical Contract was assigned, or whether the contract somehow became "her" (*i.e.*, Nedra's) contract. John Lester and SDI also provided no evidence to show whether this contract was a valuable contract that generated profits, or instead was a money-losing contract. To the extent John Lester or SDI are asserting a cause of action against Nedra Dean based on usurpation of SDI's opportunities, there is no credible evidence to

---

[126] Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 167 (Nedra Dean testimony).

[127] *Pretrial Brief of Plaintiff John P. Lester*, Adv. No. 16-4147, ECF No. 58 at 6. *See also* Pls.' Ex. 70 (Assignment agreement for MTC Medical Contract).

support that charge, nor is there any credible evidence of any damages to John Lester or SDI resulting from this transfer.

### 4. *Fourth Count:  Common law fraud*

John Lester and SDI next assert common law fraud claims against Nedra Dean.

The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.[128]

John Lester and SDI do not point to a specific misrepresentation made by Nedra Dean. According to John Lester and SDI, "Defendant suppressed and concealed certain material facts which she had a duty to disclose to Lester.  . . . As a proximate result of Dean's fraud, Lester and SDI have suffered economic harm in an amount to be proven at trial."  The Liquidation Complaint does not specify which alleged material facts Nedra Dean did not disclose.  John Lester and SDI allege that John Lester was not aware of payments Nedra Dean made that are detailed in the counts above, but the facts here do not support any type of claim for fraud by nondisclosure.  In *Bazan v. Munoz*, 444 S.W.3d 110 (Tex. App.—San Antonio 2014, no pet.), the court affirmed a jury finding of fraud by nondisclosure by two members of an LLC, which owned a restaurant and bar.  The members violated the LLC agreement by "secretly" taking salaries and pocketing cover charge money in violation of the LLC agreement without telling the third member, who was not involved in operating the business.  The court noted there was evidence that the third member did not have an opportunity to discover the truth of the "secretly taken" funds.  *Id.* at 119-20 (noting fraud by nondisclosure requires, among other things, that defendant knew plaintiff was ignorant of material

---

[128] *Aquaplex, Inc. v. Rancho la Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009).

facts, that plaintiff did not have equal opportunity to discover the facts, and that plaintiff was deliberately silent when he had a duty to speak).

With respect to all payments, other than the IRS check[129] and the cashier's checks,[130] this case is distinguishable from *Bazan* for at least three independent reasons. First, most—if not all—of the payments appear to have been reflected in SDI's QuickBooks or Excel software, or at least in SDI's bank statements. Nedra Dean's actions cannot fairly be characterized as "secretly" taking funds. Second, John Lester always had access to SDI's books and records and so he had equal access to the facts. Third, because John Lester largely abandoned his duties at SDI at various times, and because of the parties' course of conduct in handling SDI's affairs, Nedra Dean's actions regarding the payments were permissible, as discussed above.

With respect to the IRS check[131] and the cashier's checks[132]—and with respect to any other payment to the extent the Court has erred in finding it permissible— John Lester's and SDI's claim for fraud fails because, as detailed above, there is no credible evidence of damages.

### 5. *Fifth Count: Conspiracy*

John Lester and SDI next assert a conspiracy claim against Nedra Dean. According to the Liquidation Complaint, "Dean entered into a conspiracy with other individuals to use unlawful means to accomplish an unlawful purpose to the detriment of Lester and SDI. . . . As a proximate result of Dean's conspiracy with others, Lester and SDI have suffered economic harm in an amount to be proven at trial."[133] The Court assumes John Lester and SDI are referring globally to all of

---

[129] Pls.' Ex. 96.

[130] Pls.' Exs. 189, 190.

[131] Pls.' Ex. 96.

[132] Pls.' Exs. 189,190.

[133] Liquidation Complaint ¶¶ 40-41.

the allegations already discussed. For all of the reasons already stated in this Opinion, John Lester and SDI failed to produce credible evidence to show that (a) Nedra Dean's actions were inappropriate, and (b) John Lester and SDI suffered any damages as a result of any inappropriate actions.

### 6. *Sixth Count: Declaratory Judgment*

John Lester and SDI next assert a declaratory judgment claim against Nedra Dean.[134] After referring globally to all of the disputes between the parties, the Liquidation Complaint states that

> a conflict exists between Dean and Lester in regard to what actions each one can carry out under the terms of the Operating Agreement and whether Dean's actions fall within the meaning of "Major Decisions" as defined by the Operating Agreement. . . . Plaintiff, therefore, requests that the Court declare the parties' rights and obligations under the Operating Agreement.[135]

John Lester now owns and controls SDI,[136] so there is no longer a dispute about how to operate SDI going forward. With respect to the prior actions of the parties, this Opinion adequately addresses the parties' rights and obligations.

### 7. *Seventh Count: Action for Involuntary Dissolution and Appointment of Receiver*

This cause of action is moot because John Lester now owns and controls SDI.

### 8. *Eighth Count: Request for an Accounting*

John Lester's and SDI's last cause of action in the Liquidation Complaint is for an accounting. According to John Lester and SDI, they need an accounting due to the Deans' seizing operational control of SDI and their use of SDI resources for personal gain.[137] The Court finds and concludes that no further accounting is necessary after the parties' extensive discovery

---

[134] Liquidation Complaint ¶¶ 42-48.

[135] Liquidation Complaint ¶¶ 47-48. The Liquidation Complaint does not specify whether Plaintiffs seek relief under the federal Declaratory Judgment Act or other statute.

[136] Pls.' Ex. 195.

[137] Liquidation Complaint ¶¶ 51-52.

opportunities and thirteen-day trial.

**B.      The Lester & SDI Claims against Nedra Dean in the Discharge Complaint**

The Discharge Complaint contains seven counts under various subsections of 11 U.S.C. §§ 523(a) and 727(a).  To except a debtor's debt from discharge under 11 U.S.C. § 523(a), or to deny a debtor a discharge under § 727(a), a plaintiff creditor must prove his or her claim by a preponderance of the evidence.[138]  In this case, John Lester and SDI have not met their burden.

### 1.      *First Count: 11 U.S.C. § 523(a)(4)*

Section 523(a)(4) of the Bankruptcy Code excepts from a debtor's discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[139]  John Lester and SDI allege that the Consultant's Report made "findings" of fraud, defalcation, and embezzlement.  The report made no such findings, and the evidence admitted in this trial is not sufficient for the Court to make those findings.

Fraud in a fiduciary capacity under § 523(a)(4) requires positive fraud involving moral turpitude or intentional wrong.[140]  Defalcation under § 523(a)(4) requires a culpable state of mind involving knowledge of, or gross recklessness with respect to, the improper nature of the fiduciary behavior.[141]  If actual knowledge of wrongdoing is lacking, the reckless conduct requires a fiduciary who consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his behavior will result in a violation of fiduciary duty.[142]  Finally, embezzlement under §

---

[138] *See Grogan v Garner*, 498 U.S. 279, 289-91 (1991) (preponderance standard applies in § 523(a) actions); *In re Wells*, 426 B.R. 579, 587–88 (Bankr. N.D. Tex. 2006) (preponderance standard applies in § 727(a) actions).

[139] 11 U.S.C. § 523(a)(4).

[140] *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754, 1759 (2013).

[141] *Id.* at 1757.

[142] *Id.* at 1759.

523(a)(4) is the fraudulent appropriation of property by a person who is entrusted with that property or who has possession of it lawfully.[143] There must be proof of the debtor's fraudulent intent in taking the property.[144]

After carefully considering all of the evidence at trial, and after weighing the credibility of the many witnesses, the Court finds and concludes that there is insufficient evidence of Nedra Dean's culpable state of mind—including moral turpitude or intentional wrong (fraud), knowledge of, or gross recklessness with respect to, the improper nature of the fiduciary behavior (defalcation), and fraudulent intent (embezzlement)—to except any debt of Nedra Dean from discharge under 11 U.S.C. § 523(a)(4).

As the Consultant's Report notes, there were many instances of unequal "distributions" (or salary) to the members Nedra Dean and John Lester. But the totality of the evidence demonstrates that Nedra Dean, for the most part, was working tirelessly and in good faith to help SDI succeed, or at the very end, to help SDI avoid unnecessary damages to SDI's contract counterparties given SDI's precarious financial condition and the severe infighting between the members. The unequal distributions suggest not moral turpitude or intentional wrong by Nedra Dean, but instead the recognition that Nedra Dean was entitled to get paid for her sweat equity while John Lester abandoned his duties, and that Nedra Dean needed the distributions for living expenses. The Court cannot find moral turpitude or intentional wrong based on this record.

Finally, two transactions gave the Court the most pause—Nedra Dean's actions regarding the $300,000 in cashier's checks, and the $53,588.65 payment of Ronald Dean's personal taxes.

---

[143] *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998).

[144] *Id*. at 602-03.

John Lester and SDI focused an inordinate amount of time at trial on these two issues. Although it is a closer call on these transactions than on the others discussed, the Court still finds insufficient evidence of moral turpitude or intentional wrong.[145] Just as important, John Lester and SDI failed to prove any damages with respect to these transactions, so there is no debt to except from discharge in any event.

### 2. *Second Count: 11 U.S.C. § 523(a)(6)*

Section 523(a)(6) of the Bankruptcy Code excepts from a debtor's discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[146] This provision requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[147] The Fifth Circuit clarified the *Kawaauhau* standard and held that an injury is "willful and malicious" when there is either an objective substantial certainty of harm or a subjective motive to cause harm.[148] John Lester and SDI allege that Nedra Dean's willful and malicious activity included (i) "misappropriation of assets," (ii) causing the termination of SDI's SBA 8(a) certification; (iii) causing the termination of the Sheppard Contract; and (iv) attempting to cause termination of the Fairchild contract.

#### a) *"Misappropriation of assets"*

The Court assumes that the misappropriation of assets John Lester and SDI refer to in the Discharge Complaint is the same laundry-list of allegations contained in the Liquidation Complaint and discussed above regarding the Consultant's Report. After carefully considering all of the evidence at trial, and after weighing the credibility of the many witnesses, the Court finds

---

[145] The Deans' testimony on these two issues was not as credible as their testimony on other issues.

[146] 11 U.S.C. § 523(a)(6).

[147] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[148] *In re Miller*, 156 F.3d at 604.

and concludes—for the same reasons detailed above—that there is insufficient evidence that Nedra

Dean was willful and malicious in her actions regarding the alleged misappropriation of assets.

*b)      Termination of SDI's SBA 8(a) certification*

John Lester and SDI allege that Nedra Dean was the sole cause of SDI's removal from the

8(a) Business Development program of the Small Business Administration's ("**SBA**").  To be

approved in the 8(a) Business Development Program, "a small business must be owned and

controlled at least 51% by socially and economically disadvantaged individuals who are citizens

of the United States."[149]  The certification through the SBA allows 8(a) firms to receive sole-source

contracts, up to a ceiling of $4 million, for goods and services.[150]  The nine-year program term

may be shortened only by termination, early graduation, or voluntary withdrawal.[151]

Based on the economic and ethnic status of both John Lester and Nedra Dean, SDI received

its 8(a) certification on or about January 21, 2011.[152]  Discord between John Lester and Nedra

Dean concerning participation in the 8(a) program first occurred in 2013 when Nedra Dean alleged

that John Lester was not properly disclosing the nature of his ownership interest in various

companies to the SBA.[153]  SDI remained 8(a) compliant, however, until at least January 2016.  In

January 2016, Nedra Dean notified an SBA official by email that she did not plan to move forward

within the 8(a) program, and she requested a voluntary withdrawal from the 8(a) program, citing

an impasse between herself and John Lester.[154]  John Lester, in contrast, told the SBA that he

---

[149] *See* 13 C.F.R. § 124.105.

[150] *See* 13 C.F.R. § 124.506(2)(ii).

[151] *See* 13 C.F.R. § 124.2.

[152] Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 47.

[153] Pls.' Ex. 57.

[154] Def.'s Ex. T.

wanted to complete a "change of ownership" in order to keep SDI's 8(a) certification.[155] Nedra Dean and John Lester were unable to come to an agreement concerning a change in ownership, and John Lester declined to sign the voluntary withdrawal from the 8(a) program.[156]

On February 25, 2016, Kevin Sloan from the SBA informed Nedra Dean and John Lester that "the voluntary withdrawal method/option is the **MOST** optimal approach considering the SDI's partners are at an impasse."[157] On March 3, 2016, SDI received a "Letter of Intent to Terminate" from the SBA.[158] The SBA's stated reasoning behind the proposed 8(a) program termination was that SDI "failed to submit the Annual Review update information requested by the Dallas/Ft. Worth District Office Development staff by UPS return receipt requested."[159] The SBA also noted that a significant impasse between the partners also led to the proposed termination.[160] Sometime thereafter (the record is unclear exactly when), SDI's participation in the 8(a) program ended.

Ultimately, the evidence is conflicting as to who failed to fill out the "Annual Review update information," one of the SBA's stated reasons for the termination. But there is no dispute that John Lester and Nedra Dean were at an impasse (on just about everything), the SBA's second stated reason for 8(a) program termination. After carefully considering all of the evidence at trial, and after weighing the credibility of the many witnesses, the Court finds and concludes that there is insufficient evidence that Nedra Dean was willful and malicious in her actions regarding SDI's termination from the 8(a) program.

---

[155] *Id.*

[156] *See* Adv. No. 16-4147, ECF No. 149, 3/27/18 Trial Transcript at 23.

[157] Def.'s Ex. U.

[158] Def.'s Ex. HH.

[159] *Id.*

[160] *Id.*

<em>c)      Termination of the Sheppard Contract</em>

John Lester and SDI assert that Nedra Dean was willful and malicious in causing SDI to lose its contract with Sheppard Air Force Base (the "***Sheppard Contract***").  The Sheppard Contract was a contract with the United States of America to staff medical personnel at Sheppard Air Force Base.  Based on the efforts of the Deans, SDI was awarded the Sheppard Contract commencing October 1, 2015.[161]  The Sheppard Contract was a three-year contract, one base year with two option years.[162]  The base year award for the contract was approximately $1.4 million, and the total award could have been up to $4 million if the two options were exercised by Sheppard Air Force Base.[163]

Cecilia Murray, who worked at Sheppard Air Force Base as a contracting officer since 2009,[164] testified that on July 14, 2016, the United States informed SDI of its intent to exercise the first option year under the Sheppard Contract, commencing October 1, 2016.  The notice, however, specifically stated, "This notice of intent does not commit the Government to extend the contract."[165]

Between August 12-15, 2016, Nedra Dean had several phone conversations with Sheppard representatives concerning the contract and SDI's financial issues.[166]  In the meantime, on August 18, 2016, John Lester held a conference call with Sheppard representatives to discuss SDI's continuing ability to perform the first option year of the Sheppard Contract.  John Lester then had

---

[161] Pls.' Ex. 63.

[162] *Id.*  John Lester testified, incorrectly, that the Sheppard Contract contained three option years as opposed to two option years.

[163] These figures represent the potential *gross* revenues from the contract, and not the profits from the contract.

[164] Adv. No. 16-4147, ECF No. 144, 3/7/18 Trial Transcript at 187 (testimony of Cecilia Murray).

[165] Pls.' Ex. 130.

[166] Adv. No. 16-4147, ECF No. 144, 3/7/18 Trial Transcript at 203; *see also* Pls.' Ex. 99.

several subsequent communications requesting that the federal government formally exercise the first option year under the Sheppard Contract.[167]  On August 24, 2016, however, Nedra Dean sent Ms. Murray an email confirming that SDI would not be able to perform its obligations should the government exercise the first option year.[168]  Prior to receipt of Nedra Dean's August 24, 2016 email, Sheppard Air Force Base had made the formal decision to not exercise the first year option under the Sheppard Contract, but instead to enter into a contract with a third party commencing upon the expiration of the base term the Sheppard Contract.[169]  Sheppard Air Force Base changed vendors "due to self-identified financial issues by Ms. Dean."[170]

Ronald Dean testified that SDI was not financially sound and could not go forward with the Sheppard Contract.[171]  The overall evidence also reflects that John Lester and Nedra Dean were hopelessly deadlocked and that SDI could not continue to function effectively in its business with the extreme infighting between the members.  The Court believes Nedra Dean was doing what she thought was the best course of action given the financial and internal struggles at SDI.  After carefully considering all of the evidence at trial, and after weighing the credibility of the many witnesses, the Court finds and concludes that there is insufficient credible evidence that Nedra Dean was willful and malicious in her actions with respect to the Sheppard Contract termination.

---

[167] Pls.' Ex. 67.

[168] Pls.' Ex. 131.

[169] Pls.' Exs. 131, 99.

[170] Pls.' Ex. 99.

[171] *See* Adv. No. 16-4147, ECF No. 157, 4/24/18 Trial Transcript at 217, 228, 248.

*d)* *Attempted termination of Fairchild Contract*

There is little or nothing in the record to support John Lester's and SDI's allegation regarding the Fairchild contract, and there is certainly no evidence of any damages or any willful or malicious conduct by Nedra Dean.

### 3. *Third Count: 11 U.S.C. § 727(a)(2)*

Section 727(a)(2) of the Bankruptcy Code provides that a court shall grant the debtor a discharge unless—

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of the petition; or
>
> (B) property of the estate, after the date of the filing of the petition.[172]

John Lester and SDI allege that the Court should deny Nedra Dean her discharge under § 727(a)(2) because (i) she transferred "her" contract, the MTC Medical Contract, to Ronald Dean's company prior to the bankruptcy petition date, and (ii) she disposed of SDI assets located in six storage units on or about August 27-28, 2016.

*a)* *Transfer of the MTC Medical Contract*

There is insufficient evidence to show whether Nations Professional Staffing, as a company, was still in existence when the MTC Medical Contract was assigned, or whether the contract somehow became "her" (*i.e.*, Nedra's) contract, as John Lester and SDI allege. In addition, John Lester and SDI provided no evidence to show whether this contract was a valuable contract that generated profits (that she would want to keep from creditors), or instead was a

---

[172] 11 U.S.C. § 727(a)(2).

money-losing contract. John Lester and SDI failed to prove that Nedra Dean transferred *her* assets or that she transferred any assets with the intent to hinder, delay, or defraud her creditors.

<em>b)      Disposal of SDI assets in storage units</em>

The parties dispute the propriety of Nedra Dean's alleged disposal of SDI assets that have been in storage since 2014, a subject of several emails between the parties.[173] The Court need not decide whether Nedra Dean's actions were appropriate because it is uncontested that the assets in dispute are not "property of the debtor" or "property of the estate," which are the subject of § 727(a)(2).

### 4. *Fourth Count: 11 U.S.C. § 727(a)(3)*

Section 727(a)(3) of the Bankruptcy Code provides that a court shall grant the debtor a discharge unless—

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.[174]

"[T]he creditor objecting to the debtor's discharge bears the initial burden of production to present evidence that the debtor failed to keep adequate records and that the failure prevented the creditor from evaluating the *debtor's* financial condition."[175]

John Lester and SDI allege that "Defendant has repeatedly evaded production of *business* records upon request of Lester. Upon information and belief, the Defendant is concealing these records or has simply failed to preserve them."[176] John Lester and SDI focus on *SDI's* records,

---

[173] *See, e.g.,* Pls.' Exs. 62, 199; Def.'s Ex. BB.

[174] 11 U.S.C. § 727(a)(3).

[175] *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 697 (5th Cir. 2009) (emphasis added).

[176] Discharge Complaint ¶ 54 (emphasis added).

which are not the subject of § 727(a)(3). John Lester and SDI have not alleged that Nedra Dean failed to keep adequate *personal* records from which John Lester and SDI could evaluate *Nedra Dean's* financial condition. Even if SDI's business records were relevant, there is no credible evidence that Nedra Dean concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which her financial condition or business transactions might be ascertained.

5. ***Fifth Count: 11 U.S.C. § 727(a)(4)(A-B)***

Section 727(a)(4) of the Bankruptcy Code provides in relevant part that a court shall grant the debtor a discharge unless "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account" or "presented or used a false claim."[177] According to John Lester and SDI, "If the Court finds that the explanations for the disposition and misappropriation of assets, including the transfer of the MTC Medical Contract and SDI funds, ultimately belonging to Lester, are false, the Defendant's discharge should be denied in accordance with section 727(a)(4) of the Code."[178]

For all of the reasons detailed above, the Court does not find Nedra Dean's explanations to be false with respect to any material issue.

6. ***Sixth Count: 11 U.S.C. § 727(a)(5)***

Section 727(a)(5) of the Bankruptcy Code provides in relevant part that a court shall grant the debtor a discharge unless "the debtor has failed to explain satisfactorily, before determination

---

[177] 11 U.S.C. § 727(a)(4).

[178] Discharge Complaint ¶ 58.

of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."[179]

According to John Lester and SDI, "Defendant cannot meet the standards of section 727(a)(5) to satisfactorily explain the *loss of SDI's assets* and other assets of the bankruptcy estate, [and thus] the Court should deny the Defendant's discharge."[180] Loss of SDI assets is not relevant to the § 727(a)(5) determination,[181] and there is insufficient credible evidence that Nedra Dean failed to explain any loss of her personal assets.

### 7. *Seventh Count: 11 U.S.C. § 707(b)(3)*

John Lester and SDI cite case-dismissal sections of the Bankruptcy Code in support of their request to deny Nedra Dean a discharge. Section 707(b)(1) of the Bankruptcy Code provides in relevant part that a court may dismiss a case of an individual debtor "if it finds that the granting of relief would be an abuse of the provisions of this chapter." In making this abuse determination, a court may consider whether the debtor filed the bankruptcy in bad faith and whether the totality of the circumstances of the debtor's financial condition demonstrates abuse.[182]

According to John Lester and SDI—

In light of the pending litigation against the Defendant in State Court, it appears that the Defendant commenced these bankruptcy proceedings to disentangle herself from the inevitable punishment that would befall her illegal misdeeds with respect to SDI. The Defendant filed the bankruptcy petition as an evasion tactic. She, therefore, desires to use the bankruptcy process for a reason that constitutes bad

---

[179] 11 U.S.C. § 727(a)(5).

[180] Discharge Complaint ¶ 61 (emphasis added).

[181] In closing arguments, John Lester and SDI suggested that Nedra Dean's actions resulted in the loss of the Sheppard Contract, which they argued was the biggest loss to the bankruptcy estate under § 727(a)(5). The Sheppard Contract is not property of the estate because it is an SDI contract. It is questionable whether Nedra Dean should have exercised management decisions for SDI after her bankruptcy filing and the appointment of a Chapter 7 trustee, which she apparently did on the advice of counsel. Nevertheless, the Chapter 7 trustee has not complained about that action, and the Court finds that Nedra Dean acted in good faith regarding the Sheppard Contract.

[182] 11 U.S.C. § 707(b)(3).

faith and an abuse of the provisions and underlying policies of the Bankruptcy Code.[183]

After carefully considering all of the evidence at trial, and after weighing the credibility of the many witnesses, the Court finds and concludes that there is no credible evidence that Nedra Dean filed her bankruptcy petition in bad faith or as an evasion tactic.

## C.    Liquidation of Nedra Dean's claims against John Lester

Nedra Dean asserts causes of action against Lester for breach of fiduciary duty, common-law fraud, breach of contract, and trade-secret misappropriation.

### 1.  *Breach of fiduciary duty*

Nedra Dean alleges that John Lester breached his fiduciary duties to SDI and to her through various misdeeds, including abandoning his management responsibilities, committing workers' compensation fraud, causing SDI's removal from the SBA's 8(a) Business Development program, and establishing competing businesses through different companies. Nedra Dean's claims fail for three independent reasons.

First, the vast majority of Nedra Dean's allegations relate to harm that John Lester allegedly caused SDI. Nedra Dean is no longer a member of SDI, and she does not have standing, individually or derivatively, to assert SDI's causes of action, including breach of a fiduciary duty owed to SDI.

Second, Nedra Dean did not plead or prove an informal fiduciary relationship between John Lester and Nedra Dean to support a finding that John Lester owed her a fiduciary duty.[184]

---

[183] Discharge Complaint ¶ 64.

[184] *See Fed. Ins. Co. v. Rodman.*, 2011 WL 5921529 at *3 (N.D. Tex. Nov. 29, 2011) (stating that there is no formal fiduciary relationship created as a matter of law between members of an LLC, but recognizing that an informal fiduciary relationship may arise under particular circumstances where there is a close, personal relationship of trust and confidence).

Third, even if John Lester did owe a fiduciary duty to Nedra Dean herself, Nedra Dean did not provide credible evidence of damages to her individually (including her purported mental anguish), as opposed to derivative harm caused by injury to SDI.

### 2. *Common-law fraud*

Nedra Dean next asserts a common-law fraud claim against John Lester.

> The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.[185]

Nedra Dean's fraud claim fails for three independent reasons. First, the vast majority of Nedra Dean's allegations relate to harm that John Lester allegedly caused SDI. Nedra Dean is no longer a member of SDI, and she does not have standing, individually or derivatively, to assert SDI's causes of action, including fraud against SDI.

Second, Nedra Dean did not prove any misrepresentation by John Lester or Nedra Dean's reliance on any misrepresentation.

Third, even if John Lester's actions could be considered some type of misrepresentation, Nedra Dean did not provide credible evidence of damages to her individually (including purported mental anguish), as opposed to derivative harm caused by injury to SDI.

### 3. *Breach of contract*

Nedra Dean next asserts a breach-of-contract claim against John Lester. "Under Texas law, a party asserting breach of contract must prove: (1) the existence of a valid contract; (2) that the [party] performed or tendered performance; (3) that the other party breached the contract; and

---

[185] *Aquaplex*, 297 S.W.3d at 774.

(4) that the party was damaged as a result of the breach."[186] Nedra Dean's contract claim fails for two independent reasons.

First, the vast majority of Nedra Dean's allegations relate to harm that John Lester allegedly caused SDI. Nedra Dean is no longer a member of SDI, and she does not have standing, individually or derivatively, to assert SDI's causes of action, including breach of contract with SDI.

Second, even if John Lester's actions could be considered some type of breach of the Limited Partnership Agreement or LLC Agreement, Nedra Dean, as a purported contract-counterparty, did not provide credible evidence of damages to her individually (including purported mental anguish), as opposed to derivative harm caused by injury to SDI.

### 4. *Trade-secret misappropriation*

Nedra Dean finally asserts a trade-secret misappropriation claim against John Lester. This claim, if valid, clearly belongs to SDI. Nedra Dean has no standing to assert this claim on SDI's behalf.

### D. Expert report and testimony of Zack Tannery

As detailed above, Plaintiffs failed to prove claims or damages with respect to their causes of action. Nevertheless, the Court will address the expert report and expert testimony of Zack Tannery.

---

[186] *City of Dallas,* 847 F.3d at 287 (5th Cir. 2017).

To establish damages, John Lester engaged Zack Tannery with RWS Business Valuation Services[187] as an expert witness to prepare a business valuation for SDI as of December 31, 2012[188] and to testify at trial in support of his report. Federal Rule of Evidence 702 requires that courts ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand."[189] The Court has carefully considered Tannery's testimony and the Tannery Report. For the reasons detailed below, the Court concludes that Tannery's testimony was wholly unpersuasive, and the Tannery Report is strikingly flawed in its methodologies and foundations and its conclusions are not reliable or relevant to the asserted claims before the Court. Before specifically addressing each of the calculations and conclusions contained in the Tannery Report, the Court makes the following observations about the report.

Tannery specifically testified that in performing his analysis and preparing the Tannery Report, he reviewed "the tax returns, the financial statements, the [Orta] report, and extensive conversations with [John Lester]."[190] On cross-examination, however, Tannery admitted that he did not vet or verify the accuracy of any of the data provided to him by John Lester, and he did not look at or review any of SDI's contracts (which constitute the primary assets of SDI), bank statements, or many other relevant source documents to verify the accuracy of the numbers upon which he relied in the Tannery Report.[191] Rather, Tannery just assumed the numbers provided by

---

[187] Zack Tannery and RWS Business Valuation Services shall collectively be referred to herein as "***Tannery***."

[188] Pls.' Exs. 174, 175, and 176. The business valuation report prepared by Tannery is dated August 16, 2017 and is referred to herein as the "***Tannery Report***."

[189] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

[190] *See* Adv. No. 16-4147, ECF No. 148, 3/26/18 Trial Transcript at 19.

[191] *See Id.* at 83-84, 96-98.

John Lester were accurate[192] and he "believed" the numbers were accurate.[193] Although Tannery testified that he "believed" the numbers he was using in the Tannery Report were accurate, he ultimately admitted that he has "no opinion" of the accuracy of most of the numbers that he used to form the basis of much of his report.[194]

Although Tannery initially denied that John Lester wrote portions of the Tannery Report,[195] upon further questioning by the Court, Tannery finally admitted that portions of the Tannery Report were, in fact, written by John Lester.[196] Finally, in response to valid cross-examination questions seeking insight into the "sophisticated system" Tannery uses in his valuations, Tannery responded, "It's proprietary. I am not going to tell you a thing about it."[197] When asked again if he used "a policies and procedures, a manual of sorts, a standard of practice of, you know, for valuation of companies that you utilize?" he replied "yes . . . and I said earlier, I'm not going to tell you one thing about it."[198] As a result of Tannery's refusal to describe the methodologies he used to arrive at his conclusions, it is not possible for the Court to determine if such methodologies are sound or reliable.

Now the Court will briefly address each of the calculations performed by Tannery in the Tannery Report.

---

[192] *Id.* at 83-84, 131.

[193] *Id.* at 83-84.

[194] *See Id.* at 173-180.

[195] *Id.* at 136.

[196] *Id.* at 175; *see also* Pls.' Ex. 174 (*e.g.*, the Tanner Report states: "I and/or the company was deprived of potential revenue from a contract that was lost due to negligence" and "I and/or the company was deprived of potential revenue or interests from a special certification (i.e., SBA 8a)").

[197] Adv. No. 16-4147, ECF No. 148, 3/26/18 Trial Transcript at 74.

[198] *Id.* at 90.

### 1. *Future Value Calculation for $138,000 Loss is $193,552.14 (7%) – 5 Years.* [199]

Tannery's first calculation addressed his assumption concerning "money that was misappropriated in 2013." He then calculated the future value of $138,000 in five years using a 7% rate to arrive at his damages opinion of 193,552.14.[200] As the Court has found and concluded, there was not sufficient evidence to establish the existence of "money that was lost or misappropriated in 2013." In addition, no credible facts or data were identified in the Tannery Report or in Tannery's testimony that justifies using five years or 7% for his calculation. The Court finds and concludes that this damages opinion is not credible, not reliable, and not relevant. Rather, Tannery's first calculation represents nothing more than "faulty data in, faulty data out."

### 2. *Future Value Calculation for $140,000 Loss is $210,414.94 (8.49%) – 5 Years.* [201]

Tannery's second calculation addressed his assumption concerning "$140k paid to defendant's husband's company without authorization in 2013." He then calculated the future value of $140,000 in five years using an 8.49% rate to arrive at his damages opinion of 210,414.94.[202] First, it is unclear what unauthorized payments to which Tannery is referring. The Consultant's Report found no unauthorized payments to any company owned by Ronald Dean. Perhaps Tannery meant to refer to Ms. Orta's $138,945 adjustment for "checks that cleared through the bank that were, within the QuickBooks system, noted as being checks to R.L. Dean or Ronald Dean & Associates but they were checks that were actually written to Nedra Dean."[203] If this adjustment (for a payment to Nedra Dean, not to Ronald Dean's company) is what Tannery

---

[199] Pls.' Ex. 174.

[200] *Id.*

[201] *Id.*

[202] *Id.*

[203] Adv. No. 16-4147, ECF No. 144, 3/7/18 Trial Transcript at 176.

meant, there was not sufficient evidence to establish a breach of fiduciary duty or breach of contract from this transaction. In addition, no credible facts or data were identified in the Tannery Report or in Tannery's testimony that justifies using five years or the 8.49% for his calculation. The Court finds and concludes that this damages opinion is not credible, not reliable, and not relevant. Rather, just like his first calculation, Tannery's second calculation represents nothing more than "faulty data in, faulty data out."

### 3. *Future Value Calculation for $75,000 Loss is $105,191.38 (7.00%) – 5 Years.* [204]

Tannery's third calculation addressed his assumption concerning "[e]stimated $75k in unsubstantiated/non-business credit card charges." He then calculated the future value of $75,000 in five years going back to his 7.00% rate to arrive at his damages opinion of 105,191.38.[205] As the Court has found and concluded, there was not sufficient evidence to establish that there was "$75k in unsubstantiated/non-business credit card charges." In addition, no credible facts or data were identified in the Tannery Report or in Tannery's testimony that justifies using five years or the 7.00% for his calculation. The Court finds and concludes that this damages opinion is not credible, not reliable, and not relevant. Rather, this calculation also represents nothing more than "faulty data in, faulty data out."

### 4. *Future Value Calculation for $561,000 (Total annual contract equals $1,100,000) with 51% Ownership.* [206]

Tannery's fourth calculation addressed his assumption that—

I and/or the company was deprived of potential revenue from a contract that was lost due to negligence (e.g., lost a contract that had three remaining years on it, that had an annual revenue of approximately $1.1 million and we had 51% of the

---

[204] *Id.*

[205] *Id.*

[206] *Id.*

contract as the Prime and I could have received approximately $40k per year if the contract continued).

There are several alarming concerns about this calculation. First, Tannery makes wrong assumptions in this calculation. For example, Tannery wrongly assumes that the Sheppard Contract (the subject of this calculation)[207] had three years remaining after its termination. In fact, there were only two option periods remaining on the contract, assuming the government would exercise both remaining options. Second, Tannery's testimony concerning an unexplained number of $843,162.74 in this calculation was nonsensical and incomprehensible.[208] And in response to a series of reasonable questions from Nedra Dean concerning the failure of Tannery to consider costs associated with such contracts in his calculation, he gave condescending, flippant, and absurd responses. In the final analysis, it appears that Tannery, John Lester, and SDI believe the amount of alleged damages associated with this calculation is $561,000,[209] which simply represents 51% of one year of gross revenue to be received from the Sheppard Contract. What makes that opinion ridiculous on its face is that the vast majority of gross revenue received by SDI for any staffing contract, including the Sheppard Contract, was used to pay the salaries of the medical staff associated with the specific contract as well as overhead, leaving a relatively small margin for profit. The Court finds and concludes that this damages opinion calculation is not credible, not reliable, and not relevant. Rather, this calculation also represents nothing more than "faulty data in, faulty data out."

---

[207] Adv. No. 16-4147, ECF No. 148, 3/26/18 Trial Transcript at 38.

[208] *Id.* at 38-39.

[209] Adv. No. 16-4147, ECF No. 175, 6/20/18 Trial Transcript at 26-27.

### 5. *Future Value Calculation for $1,000,000 (Four (sic) annual contract at $1,000,000 each).* [210]

Tannery's fifth calculation addressed his assumption that--

I and/or the company was deprived of potential revenue or interest from a special certification (i.e., SBA 8a) that was lost due to my former partner's (e.g., would have to provide a purely subjective estimate for one or two contracts that may have been able to be awarded under the SBA 8a program, for say, $4 million each during the three additional years we had remaining under the special certification which allows for 'sole source'/non-compete contracts. Assuming we could have had one or two awarded to us before we graduated from the 8a program, what is the Future Value of a scenario for four years from the contract?).

There are several alarming concerns about this fifth calculation. First, as previously noted, it is obvious that the assumption was drafted by John Lester and not Tannery. Second, this calculation assumes SDI would have retained its 8(a) certification, which is not a reasonable assumption. Third, this calculation assumes that SDI would be successful in procuring such a lucrative government contract, which is not a reasonable assumption given SDI's financial troubles and serious member infighting. Again, because the assumptions used to establish this calculation are not reasonable or reliable, the Court finds and concludes that this damages opinion calculation is not credible, not reliable, and not relevant and yet another calculation of "faulty data in, faulty data out."

### 6. *Future Value Calculation for $100,000 Loss is $123,070.53 (7%).* [211]

Tannery's sixth calculation addressed his assumption concerning—

One half of $90,0000 estimated to be personal and/or non-business credit card expenses of Defendant that would not have been approved to be paid from company funds, and approximately $10,000 taken in cash withdrawals by Defendant from various SDI bank accounts.

---

[210] Pls.' Ex. 174.

[211] *Id.*

As the Court has found and concluded, there was not sufficient evidence to establish the existence of such losses. In addition, no credible facts or data were identified in the Tannery Report or in Tannery's testimony that justify using 7% for his calculation. Again, the Court finds and concludes that this damages opinion calculation is not credible, not reliable, and not relevant and represents nothing more than "faulty data in, faulty data out."

### 7. *Future Value Calculation for $180,000 Loss is $237,969.70 (7%) 4 years.* [212]

Tannery's seventh calculation addressed his assumption concerning—

> Provide the Future Value of an Income Steam consisting of 48 monthly payments of $3,333.33 beginning November 1, 2015 to October 30, 2019. Total of $180,000. Based on lost revenue plus 50% distributions that could have been generated from the canceled Sheppard AFB.

Tannery's testimony concerning this additional calculation relating to the Shepard Contract was as incomprehensible as his testimony concerning his fourth calculation above. The Court finds and concludes that this damages opinion calculation is not credible, not reliable, and not relevant and represents nothing more than "faulty data in, faulty data out."

### 8. *Future Value Calculation for $120,000 Loss is $157,295.52 (7%) 4 years.* [213]

Tannery's eighth calculation addressed his assumption concerning—

> Provide the Future Value of an Income Stream consisting of $5,000/month for a period of four years beginning October 1, 2018 to September 30, 2022. Total is $120,000 Based on the assumption that another sole source 8 (a) contract could possibly have been awarded in the amount of $4 million for four years (i.e., $1,000,000 per year in revenue) from the 8(a) contract that was canceled.

Tannery's testimony concerning this additional calculation relating to future contracts is as flawed as his testimony concerning his fifth calculation above. The Court finds and concludes that

---

[212] *Id.*

[213] *Id.*

this damages opinion calculation is not credible, not reliable, and not relevant and represents

nothing more than "faulty data in, faulty data out."

### 9. *Future Value Calculation for $1,000,000 Loss is $1402,707.51 (8.49%) 4 years.* [214]

Tannery's ninth calculation addressed his assumption concerning—

Provide the Future Value of $1 million over a four-year period, had the company continued to sustain activities comparable to year ending December 31, 2012. Based on the Accrual Basis of Accounting for valuation of the company as of December 31, 2012. (Reference comparable Statistical Chart for years 2010-2012 Line 114 Column I - 8.49%).

Tannery's assumptions for this calculation are pie-in-the-sky assumptions and are similar

to his flawed assumptions in his fifth and eighth calculations above relating to future contracts.

The Court finds and concludes that this damages opinion calculation is not credible, not reliable,

and not relevant and represents nothing more than "faulty data in, faulty data out."

### 10. *Business Valuation Metrics used for Calculating Staffing Dynamics International, LLC as of December 31, 2012.* [215]

Tannery's final calculation is an opinion regarding the value of SDI as of December 31,

2012. The calculation is highly speculative and assumes nonexistent evidence that Nedra Dean

caused a decline in the value of SDI and dissipated its assets since 2012. The Court finds and

concludes that this damages opinion calculation is not credible, not reliable, and not relevant.

## E.       Each party's request for attorney's fees and costs

Each party has requested an award of attorney's fees and costs. [216]  The American Rule is

a bedrock principle of our country's court system, where each litigant pays its own attorney's fees,

---

[214] *Id.*

[215] *Id.*

[216] Normally, a claim for attorney's fees must be made by motion filed no later than 14 days after entry of judgment unless the substantive law requires those fees to be proved at trial as an element of damages.  FED. R. BANKR. P. 7054; FED. R. CIV. P. 54(d)(2)(A)-(B).  The fees at issue here do not appear to be an element of damages under Texas law.

win or lose, unless a statute or contract provides otherwise.[217] The American Rule is to be followed absent express contractual authority or "absent explicit statutory authority" that is "specific and explicit" as to the allowance of attorney's fees.[218]

No party requested fees in the Discharge Complaint, and 11 U.S.C. §§ 523 and 727 do not contain an independent source of authority to award fees to the prevailing party.[219]

All parties requested fees in the Liquidation Complaint but cited no statutory authority for an award of fees and costs. Instead, John Lester testified that he was seeking fees under section 3.02 of the Operating Agreement,[220] which provides that SDI "and all other Members are hereby indemnified, defended, and held harmless from any losses or liabilities sustained by them because of the breach of this Section by the Member committing such breach."[221] As detailed above, no party proved losses caused by the other party's alleged breaches of the Operating Agreement, so no party is entitled to an award of fees and costs under this provision. To the extent this provision could be construed as a "prevailing party" provision, the Court still would not award fees and costs to any party in connection with the Liquidation Complaint.

To determine if a party is a "prevailing party," Texas law requires a court to examine whether the party successfully prosecutes or defends the "main issue" in the proceeding, and the

---

*See Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035, 1040 (5th Cir. 2014). The Court construes the parties' pleadings and closing arguments to be a request for the Court to rule on issue of liability for fees before receiving submissions on the value of services. *See* FED. R. CIV. P. 54(d)(2)(C).

[217] *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015).

[218] *Id.*

[219] When a creditor seeks attorney's fees for prosecuting a nondischargeability action, the court can award attorney's fees, which themselves are nondischargeable, if such fees are authorized under applicable state law and if the fees arise from or are on account of conduct that resulted in a nondischargeable debt. *See In re Kirk*, 525 B.R. 325, 330-36, 338 (Bankr. W.D. Tex. 2015). *Kirk* is not on point factually because John Lester and SDI are not entitled to fees under the language of the Operating Agreement.

[220] Adv. No. 16-4147, ECF No. 143, 3/6/18 Trial Transcript at 71.

[221] Pls.' Ex. 3, Operating Agreement § 3.02.

remedy actually obtained by that party.[222] The main issue in the Liquidation Complaint is who, if anybody, proved the necessary elements of breach of fiduciary duty and breach of the Operating Agreement.

SDI and John Lester failed to prove their claims against Nedra Dean in the Liquidation Complaint, and Nedra Dean failed to prove her counterclaims against SDI and John Lester in the Liquidation Complaint. "Some might argue that not every lawsuit produces a winner (even cases that go to verdict); the parties could battle to what amounts to a draw, pay their own fees and expenses, and go home."[223] This is one of those cases. SDI, John Lester, and Nedra Dean have battled to a draw in the Liquidation Complaint, so neither party is a prevailing party, and neither party is entitled to an award of fees and expenses.[224]

Even if one party or the other could be considered the prevailing party, the Court still would decline to award fees.

> Where attorney's fees are provided by contract, a trial court does not possess the same degree of equitable discretion to deny such fees that it has when applying a statute allowing for a discretionary award. Nevertheless, a court in its sound discretion may decline to award attorney's fees authorized by a contractual provision when it believes that such an award would be inequitable and unreasonable.[225]

---

[222] *In re WBH Energy, LP*, No. 15-10003-HCM, 2016 WL 3049666, at *12 (Bankr. W.D. Tex. May 20, 2016) (analyzing and harmonizing Texas opinions on prevailing party meaning), *aff'd sub nom. In re: WBH Energy, LP U.S. Energy Dev. Corp. v. CL III Funding Holding Co., LLC*, No. 1: 16-CV-884-LY, 2017 WL 663561 (W.D. Tex. Feb. 17, 2017), *aff'd sub nom. Matter of WBH Energy, L.P.*, 708 F. App'x 210 (5th Cir. 2018).

[223] *Intercontinental Group P'ship v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 659 n.42 (Tex. 2009).

[224] *Bumper Man, Inc. v. Smit*, No. 3:15-CV-02434-BF, 2017 WL 78508, at *4–5 (N.D. Tex. Jan. 5, 2017) (quoting the "battled to a draw" language from *Intercontinental Group P'ship* and declining to award fees to either party when each party successfully defended against the other's claims).

[225] *Cable Marine, Inc. v. M/V Trust Me II*, 632 F.2d 1344, 1345 (5th Cir. 1980). *See also Rodriguez v. Quicken Loans, Inc.*, 257 F. Supp. 3d 840, 844 (S.D. Tex. 2017) ("Even when a party has satisfied Rule 54(d)(2)'s procedural requirements and the governing substantive law permits recovery, the decision whether to award attorney's fees and expenses remains subject to the district court's equitable discretion."); *Bumper Man, Inc.*, 2017 WL 78508, at *4–5 (concluding that it would be inequitable and unreasonable to award attorney fees to either party under the circumstances of the case); *Miller v. Ocwen Loan Servicing, LLC*, No. 4:13-CV-749, 2015 WL 3899574, at *2 (E.D. Tex. June 23, 2015) ("Defendants are correct that the Court could award attorneys' fees in this case, but in exercise

The Court finds and concludes that it would be inequitable and unreasonable to award fees to any party given each party's limited success in the Liquidation Complaint.

## V.  CONCLUSION

SDI and John Lester shall take nothing on their claims and causes of action against Nedra Dean.  Even if SDI and John Lester have valid claims against Nedra Dean, Plaintiffs failed to prove that the claims are nondischargeable under 11 U.S.C. § 523.  Plaintiffs also failed to prove that the Court should deny Nedra Dean her discharge under 11 U.S.C. §§ 707 and 727.  Finally, Nedra Dean shall take nothing on her counterclaims and causes of action against John Lester and SDI. No party is entitled to an award of fees and costs.

### ### END OF MEMORANDUM OPINION ###

---

of the Court's discretion, the motion is denied because the Court finds that such an award would be inequitable and unreasonable.... Although the Court finds no remedy for Plaintiff in this case, the Court does not agree that Defendants were completely innocent in the events that occurred in this case.").